

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

VESTAS WIND ENERGY SYSTEMS A/S )
)
    Plaintiff, )
)
    v. )  Case No.
)
NORTHERN ALTERNATIVE ENERGY, )
INC., NAVITAS ENERGY, INC., )  **05C 722**
MENDOTA HILLS, LLC, and )  Jury Demanded
GAMESA ENERGIA, S.A. )
)
    Defendants. )

**FILED**
FEB - 4 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

JUDGE LEINENWEBER

MAGISTRATE JUDGE KEYS

### COMPLAINT

Plaintiff Vestas Wind Systems A/S, formerly known as NEG Micon A/S (plaintiff is hereafter referred to as "Micon A/S"), by its attorneys, for its complaint against defendants Northern Alternative Energy, Inc. ("NAE"), Navitas Energy, Inc. ("Navitas Energy"), Mendota Hills, LLC ("Mendota"), and Gamesa Energia, S.A. ("Gamesa Energia") states as follows:

### NATURE OF THE ACTION

1.    Micon A/S is one of the world's largest manufacturers of wind turbines. Micon A/S incorporated NEG Micon USA, Inc. ("Micon USA") as its wholly owned subsidiary for the purpose of, among other things, marketing and selling on Micon A/S's behalf, and for the benefit of Micon A/S, wind turbines manufactured by Micon A/S to customers located in the United States.

2.    In October 1999, Micon USA, acting as Micon A/S's duly authorized agent, entered into a contract with NAE, a Minnesota corporation controlled by Gregory Jaunich. Under the contract, Micon USA and NAE agreed to jointly fund a pre-development investigation of northern Illinois wind resources and, if a wind power plant was developed, that Micon A/S

wind turbines would be used. NAE's CEO Gregory Jaunich (who executed the contract) and Micon USA's CEO (who also executed the contract) knew that, pursuant to the contract, Micon A/S would supply wind turbines manufactured by Micon A/S in Denmark.

3.     After the contract was executed, NAE transferred its development rights in northern Illinois to a related corporation, defendant Navitas Energy. At all times relevant to this dispute, Navitas Energy was an alter ego corporation of NAE and was its successor and assignee with respect to the Illinois development rights and obligations, including the contract with Micon USA. Navitas Energy, in turn, created defendant Mendota for the sole purpose of developing a project in northern Illinois.

4.     A project arising out of the pre-development investigation has been built in northern Illinois. However, the contractual obligation to purchase Micon A/S wind turbines for the project has been breached. Turbines have been purchased from Gamesa Eolica, S.A., an affiliate of defendant Gamesa Energia which, not coincidently, had purchased a majority interest in Navitas Energy shortly before the development of the Illinois project and became the owner of the Illinois project company, Mendota. Micon A/S has been damaged by the breach of the contract by the amount of profits it would have earned if the contract had not been breached and if Micon A/S turbines had been purchased as required by the contract.

## THE PARTIES

5.     Plaintiff Vestas Wind Energy Systems A/S merged with NEG Micon A/S with the new entity being Vestas Wind Energy Systems A/S. The term "Micon A/S" refers to NEG Micon A/S before the merger and Vestas Wind Energy Systems A/S after the merger. Vestas Wind Energy Systems A/S is a Danish corporation with its principal place of business in Denmark. Pre-merger, NEG Micon USA, Inc. was a wholly owned subsidiary of NEG Micon A/S. It is now a wholly owned subsidiary of Vestas Wind Energy Systems A/S, and it is in the

- 2 -

process of merging with Vestas American Wind Technologies, Inc. The term "Micon USA" refers to NEG Micon USA, Inc. and, as of the effective date of its merger, also refers to Vestas American Wind Technologies, Inc.

6.     On information and belief, defendant NAE is a Minnesota corporation with its principal place of business at 626 Railroad Avenue East, Delano, Minnesota, 55328. NAE is in the business of developing wind power generation facilities. NAE is controlled by Gregory Jaunich. The current CEO of NAE is John Jaunich, Gregory Jaunich's cousin.

7.     On information and belief, defendant Navitas Energy is a Minnesota corporation with its principal place of business at 3001 Broadway Street NE, Suite 695, Minneapolis, Minnesota, 55413. Navitas Energy is in the business of developing wind power generation facilities. At the time the agreement that is attached hereto as Exhibit A was executed by Gregory Jaunich, Gregory Jaunich was using the trade name "Navitas." Shortly after the execution of the contract, Navitas Energy was formally incorporated as a wholly owned subsidiary of NAE and was controlled by Gregory Jaunich at all times until the acquisition of approximately 75% of Navitas Energy stock by Gamesa Energia.

8.     On information and belief, defendant Mendota is a Minnesota limited liability company with its principal place of business at 3001 Broadway Street NE, Suite 695, Minneapolis, Minnesota, 55413. Navitas Energy formed Mendota for the sole purpose of furthering the development of the Illinois project contemplated under the contract.

9.     On information and belief, defendant Gamesa Energia is a Spanish corporation with its principal place of business at Portal de Gamarra, n° 40 01013 Vitoria, Spain. Gamesa Energia is one of the five businesses that comprise Gamesa Corporacion Tecnologica S.A., and is an affiliate of Gamesa Eolica, S.A. ("Gamesa Eolica") a wind turbine manufacturer. Gamesa

- 3 -

Energia has purchased more than 75% of Navitas Energy and 100% of Navitas Energy's membership interest in Mendota.

## JURISDICTION AND VENUE

10.     Jurisdiction lies with this Court under 28 U.S.C. § 1332, as this action is between citizens of a State and citizens or subjects of a foreign state, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

11.     Venue in this Court is appropriate under 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL BACKGROUND

### The Contract

12.     On October 21, 1999, Micon USA entered into a contract entitled "Memorandum of Understanding" ("MOU") with NAE. The contract was executed by Gregory Jaunich, the CEO of NAE and by Andris Cukurs, the CEO of Micon USA. The contract is attached hereto as Exhibit A and incorporated herein. Pursuant to the contract, the parties agreed "to jointly participate in a pre-development investigation of a wind power plant in northern Illinois." Ex. A, ¶ 1. The wind power plant was to be the first of its kind in Illinois.

13.     Pursuant to the contract, the parties jointly investigated candidate sites for a wind power plant in northern Illinois. The parties also agreed in the contract that Micon USA would provide an in-kind contribution of one fully equipped 50 meter meterological ("met") station at one of the candidate sites. Ex. A, ¶ 1. A met station is a wind monitoring station which gathers and records data about wind patterns and speeds and is used to determine if a site is appropriate for the development of a wind power facility. The placement of a met station is one of the first steps taken when developing a wind power plant.

- 4 -

14.     Micon USA honored its contractual obligation by placing a met station at a site located in northern Illinois near Princeton (the "Princeton Met Station"). Since November 16, 1999, the Princeton Met Station installed by Micon USA has been providing valuable information necessary for the development of a wind power generation facility in northern Illinois.

15.     Pursuant to the contract, it was also agreed that NAE would establish a met station at an alternative location in northern Illinois. To fulfill this obligation, NAE leased an existing communication tower near Compton, Illinois and established a met station there on or around May 18, 2000 (the "Compton Met Station"). Since that time, the Compton Met Station has been providing valuable information necessary for the development of a wind power generation facility in northern Illinois.

16.     The information generated by the Princeton and/or Compton Met Stations was used by NAE, Navitas Energy, Mendota and Gamesa Energia in connection with the pre-development investigation of a potential wind farm in northern Illinois and in connection with the development of a wind power project in northern Illinois near Compton, a project now called Mendota Hills (the "Mendota Hills Site"). The Compton Met Station is adjacent to the Mendota Hills Site. The Mendota Hills Site has been developed as a wind power plant utilizing wind turbines manufactured by Gamesa Eolica.

17.     Pursuant to the contract, the parties jointly retained a consultant, Tom Factor of the Iowa Wind Energy Institute, to assist in the parties' pre-development activities. Micon USA was billed and paid for Mr. Factor's services related to the retrieval of data from the Princeton and Compton Met Stations.

- 5 -

18.     In entering into the contract, the intent of the parties was to "jointly propose [to a third party] a 31.5 megawatt wind power project consisting of 35 Micon 900/52 wind turbines at the best candidate site in northern Illinois." Ex. A ¶ 2. The Micon 900/52 was, at the time, a wind turbine manufactured by Micon A/S. Under the contract, "NAE would be the project developer and owner and Micon would be the exclusive supplier of the wind turbines for any project at both of [the] above-mentioned candidate sites resulting out of the pre-development investigation." Ex. A ¶ 2.

19.     Under the contract, NAE agreed to purchase from Micon USA wind turbines manufactured by Micon A/S. By entering into the contract, Micon USA acted within the authority granted to it by Micon A/S.

20.     At all relevant times, NAE, Navitas Energy, Mendota and Gamesa Energia knew that the wind turbines to be purchased through Micon USA would be manufactured and supplied by Micon A/S, and that Micon USA operated in the United States as a subsidiary of Micon A/S.

21.     At all relevant times, NAE, Navitas Energy, Mendota and Gamesa Energia knew that Micon USA was acting as Micon A/S's agent in the United States for the purpose of selling Micon A/S manufactured wind turbines, and that Micon USA, as Micon A/S's agent, entered into the contract with NAE in order to sell Micon A/S manufactured wind turbines to NAE.

### The Relationships Between NAE and Navitas Energy, Inc.

22.     Navitas Energy was created shortly after the execution of the MOU as a wholly owned subsidiary of NAE. Until Gamesa Energia acquired a majority interest in Navitas Energy, the company was controlled by Gregory Jaunich who, with his wife, was the majority owner. Gregory Jaunich has been the CEO of Navitas Energy from its inception, and he held that position until recently.

23. During the negotiation of the MOU, it was manifest that NAE and "Navitas" (a trade name used by NAE) were one and the same. NAE and other Navitas entities have sent correspondence to Micon USA on letterhead with the names of both entities. Micon USA dealt primarily with Gregory Jaunich, who was the CEO of Navitas, Inc., Navitas Energy and NAE. No one from the Jaunich family ever communicated to Micon USA or Micon A/S that NAE and Navitas Energy were independent companies.

### NAE Forms Navitas Energy and Transfers all of its Rights and Obligations under the MOU to Navitas Energy

24. On or about November 1, 2000, NAE incorporated Navitas Energy as its wholly-owned subsidiary.

25. On or about December 1, 2000, NAE divested itself of all shares of Navitas Energy through a stock dividend to NAE's shareholders, including the Jaunich family. At the time of the stock dividend, the owners of NAE and Navitas Energy were identical. At all times until a more than 75% acquisition of Navitas Energy by Gamesa Energia, the Jaunich family controlled both corporations.

26. On or about January 2, 2001, Navitas Energy and NAE entered into an asset purchase agreement. A copy of the Asset Purchase Agreement is attached as Exhibit B. Pursuant to Section 1.1(a) of the Asset Purchase Agreement, NAE agreed to transfer to Navitas Energy "the negotiating positions and bidding proposals of Seller as listed on Schedule 1.1(a)." Schedule 1.1(a) of the Asset Purchase Agreement provides:

"2. Seller is currently negotiating the terms of a power purchase agreement with Commonwealth Edison ("ComEd"), pursuant to a letter of intent, for the development of a 31.5 MW wind project to be located in Illinois."

27. The "development of a 31.5 MW wind project to be located in Illinois" that is referred to in Schedule 1.1(a) above is the same "31.5 megawatt wind power project" to be

- 7 -

located in Illinois proposed in the MOU. Ex. A, ¶ 2. In fact, by this time, the scope of the Illinois project had expanded from a contemplated 31.5 MW project to a contemplated 50 MW project.

28.     Subsequently, to complete the sale, on March 9, 2001, NAE and Navitas Energy entered into a Bill of Sale, Assignment and Assumption Agreement. A true and correct copy of the Bill of Sale is attached as Exhibit C. The Bill of Sale provides that NAE "sells, conveys, transfers, assigns and delivers to [Navitas Energy] all of [NAE'S] right, title and interest in . . . (a) All of the Negotiating Positions as listed in Schedule 1.1(A)."

29.     In addition, on May 23, 2002, NAE and Navitas Energy entered into a True-Up Agreement relating to the transfer of assets from NAE to Navitas Energy. A true and correct copy of the True-Up Agreement is attached as Exhibit D.

30.     NAE's rights and obligations under the MOU were transferred to Navitas Energy without notice to, or the consent of Micon USA and/or Micon A/S, and Navitas Energy assumed NAE's rights and obligations under the MOU as assignee and/or successor.

## Navitas Energy Forms Mendota Hills, LLC to Further The Development of the Illinois Project Contemplated by the MOU

31.     On or about March 6, 2001, Navitas Energy incorporated Mendota as a wholly-owned subsidiary and appointed Gregory Jaunich as the sole member of Mendota's Board of Governors. Navitas Energy formed Mendota to further the development of the Illinois project contemplated by the MOU, and at all relevant times to this dispute operated Mendota as if Mendota was its alter ego.

32.     On or about October 25, 2001, Navitas Energy entered into a Letter of Intent with PacificCorp Power Marketing, Inc. ("PPM") documenting PPM's opportunity to participate as the lead investor in energy projects under development by Navitas Energy. One of the energy

8 -

projects identified by Navitas Energy and PPM was the Illinois project for which Mendota had been formed to develop. Navitas Energy and PPM noted that Mendota had a Power Purchase Agreement ("PPA") with ComEd and referred to the Illinois project as the "ComEd Project." Navitas Energy stated that the ComEd project would "utilize NEG/MICON . . . wind turbine technology." The "ComEd Project" is the Illinois project contemplated by the MOU.

33.    On or about December 31, 2001, Mendota and PPM entered into a Purchase Agreement whereby Mendota agreed to sell to PPM's wholly-owned subsidiary, MAIN I, and PPM's wholly-owned subsidiary, MAIN I, agreed to purchase from Mendota, the "ComEd Project."

34.    The Illinois project was not developed by PPM; instead, Navitas Energy purchased PPM's rights and obligations regarding the Illinois project back from PPM shortly after Navitas Energy began a new relationship with Gamesa Energia. On or about June 17, 2002, Navitas Energy and PPM entered into a Sale Agreement whereby Navitas Energy agreed to purchase, and PPM agreed to sell, PPM's ownership interests in MAIN I. Around this time, Navitas Energy reacquired the Illinois project that was contemplated by the MOU from PPM, and eventually all assets of MAIN I were transferred to Mendota.

## Navitas Energy Partners with Gamesa Energia

35.    In or around May 2002, Navitas Energy entered into a Joint Development Agreement with Gamesa Energia for the development of wind power facilities in the United States. Gamesa Energia entered into the Joint Development Agreement with a purpose of facilitating the eventual sale of Gamesa Eolica manufactured wind turbines in connection with the Illinois project that was contemplated by the MOU.

36.    On or around September 2002, Gamesa Energia purchased more than 75% of the stock of Navitas Energy. The NAE/Navitas Energy website stated: "With these new Navitas

wind energy developments, the direct sales of Gamesa wind turbines will increase considerably, providing Gamesa with 80 MW of wind turbine sales in the second half of 2003." Ex. E. At or around the same time, Gamesa Energia and Gamesa Eolica, with oversight from their corporate parent, Gamesa Corporacioin Technologica S.A., began planning Gamesa Eolica's eventual supply of the wind turbines that were used in connection with the Illinois project that was contemplated by the MOU.

37.    As early as March 2003, Gamesa Energia was on notice that NAE and/or Navitas Energy and/or Mendota were contractually obligated pursuant to the MOU to purchase Micon A/S manufactured wind turbines.

38.    On or around April 25, 2003, Navitas Energy, Mendota, and Gamesa Energia entered into an Equity Purchase Agreement, whereby Navitas Energy agreed to sell, assign and transfer to Gamesa Energia, and Gamesa Energia agreed to purchase and take assignment and delivery from Navitas Energy, of 100% of the outstanding membership interests of Mendota, including all rights to the wind power project in Northern Illinois known as the Commonwealth Edison Company Project. That project is the same "ComEd Project" referred to above, and is the Illinois project that was contemplated by the MOU.

39.    None of the changes in ownership excuse defendants from their contractual obligations to Micon A/S. To the contrary, defendants are obligated to perform pursuant to the MOU.

40.    Since acquiring Navitas Energy's 100% membership interest in Mendota, Gamesa Energia has operated Mendota as its alter ego. Soon after gaining absolute control of Mendota, Gamesa Energia orchestrated the April 2003 transfer of the Illinois project that was contemplated by the MOU from Navitas Energy to Mendota. Before that transfer, Mendota had no assets. On

- 10 -

or around April 29, 2003, Navitas Energy and Mendota entered into the Navitas Transfer Agreement, whereby Navitas Energy granted, conveyed, sold, assigned, and transferred to Mendota, its successors and assigns, all of Navitas Energy's tangible and intangible assets and property of any kind, including all contracts, permits, authorizations and applications relating to the wind power project in Northern Illinois known as the Commonwealth Edison Company Project. That project is the same "ComEd Project" referred to above, and is the Illinois project that was contemplated by the MOU.

41.     Gamesa Energia completely dominates the daily affairs of Mendota. A Gamesa Energia employee acts as Mendota's Manager, and Gamesa Energia employees occupy all three seats on Mendota's Board of Governors. Gamesa Energia pays the salary of Mendota's Manager, and Mendota has no employees. From the very beginning, Gamesa Energia's complete domination of Mendota ensured that Gamesa Eolica manufactured wind turbines would be used in connection with the Illinois project that was contemplated by the MOU instead of wind turbines manufactured by Micon A/S.

42.     Navitas Energy's rights and obligations under the MOU were transferred to Mendota without notice to, or the consent of Micon USA and/or Micon A/S, and Mendota assumed Navitas Energy's rights and obligations under the MOU.

43.     On or around April 30, 2003, Navitas Energy and Mendota entered into a Development Agreement, whereby Mendota agreed to hire Navitas Energy to conduct certain development activities in order to facilitate the development of the wind power project in Northern Illinois known as the ComEd Project. That project is the same "ComEd Project" referred to above, and is the Illinois project that was contemplated by the MOU

- 11 -

## Gamesa Eolica Supplies the Illinois Project

44.     In or around April 2003, Gamesa Energia and its corporate parent, Gamesa Corporacion Technoloica S.A., gave Gamesa Energia's affiliate, Gamesa Eolica, the "go-ahead" to begin manufacturing the wind turbines that Gamesa Eolica would eventually supply for use in connection with the Illinois project that was contemplated by the MOU. Without any supply agreement in place, Gamesa Eolica began manufacturing the wind turbines that would eventually be supplied for use in connection with the Illinois project that was contemplated by the MOU.

45.     In or around June or July 2003, Gamesa Energia and Gamesa Eolica began discussing the wind turbine supply agreement that Gamesa Energia would cause Mendota to enter into with Gamesa Eolica for the supply of the wind turbines that would eventually be used in connection with the Illinois project contemplated by the MOU.

46.     In or around August 2003, the first Gamesa Eolica manufactured wind turbines that would be used in connection with the Illinois project contemplated by the MOU began to arrive in the State of Illinois. Even though no wind turbine supply agreement had been signed, Gamesa Eolica continued to manufacture and ship the wind turbines for use in connection with the Illinois project contemplated by the MOU into the State of Illinois. In fact, Gamesa Energia caused Mendota to pay a substantial portion of the final purchase price to Gamesa Eolica prior to any final agreement being signed.

47.     In or about December 2003, Gamesa Energia caused Mentoda to execute a Turbine Supply Agreement with Gamesa Eolica, obligating Mentoda to purchase the wind turbines that Gamesa Eolica was already supplying for use in connection with the Illinois project contemplated by the MOU.

- 12 -

## NAE, Navitas Energy, Mendota, and Gamesa Energia Renege on the MOU

48.     NAE, Navitas Energy, Mendota and Gamesa Energia went forward with the development of a wind power facility at the Mendota Hills Site near Compton, Illinois. This project resulted directly from the pre-development activities of Micon USA and NAE and Navitas Energy that were performed pursuant to the MOU. However, despite repeated demands, defendants refused to use Micon USA as the supplier of the wind turbines manufactured by Micon A/S as required by the MOU. Instead, they used turbines manufactured by Gamesa Energia's affiliate, Gamesa Eolica.

49.     NAE, Navitas Energy, Mendota and/or and Gamesa Energia have used the information generated by the Princeton Met Station and the Compton Met Station, which were both established pursuant to the MOU, to develop generating facilities at the Mendota Hills Site near Compton, Illinois.

50.     Defendants' failure to use Micon A/S wind turbines has damaged Micon A/S in the amount of profits that Micon A/S would have obtained if Micon A/S wind turbines had been used.

51.     The power project now being developed at the Mendota Hills Site is the first wind power plant of its kind in Illinois. In the wind power business, having experience with installing a wind turbine project in a particular jurisdiction is a major marketing point for future projects in that area. In short, being excluded from this project in direct violation of the MOU was destructive to Micon A/S's corporate good will and will cause it to lose profits in the future.

### COUNT I

### BREACH OF CONTRACT
### AGAINST NAE, NAVITAS ENERGY, MENDOTA, AND GAMESA ENERGIA

52.     Micon A/S restates the allegations in paragraphs 1 to 51 for its paragraph 52.

53.     The MOU is a valid and enforceable contract expressly entered into by Micon USA in its capacity as the agent of, and for the benefit of Micon A/S, with NAE.

54.     Micon USA and Micon A/S have performed all of their obligations under the MOU.

55.     Navitas Energy is obligated to abide by the contract because Navitas Energy is the alter ego and/or successor and/or assignee of NAE with respect to the MOU. An injustice will be perpetrated against Micon A/S if NAE is permitted to disregard its obligations under the MOU by having its alter ego entity, Navitas Energy, develop the project. In addition, Navitas Energy, which at all times relevant to this dispute has been controlled by either the Jaunich family and/or Gamesa Energia, is an assignee and successor to NAE with respect to the MOU. Navitas Energy assumed NAE's rights and obligations under the MOU without notice to, or the consent of Micon USA and/or Micon A/S. Accordingly, NAE and Navitas Energy are liable to Micon A/S for the breach of the MOU.

56.     Mendota also is obligated to abide by the contract because it is the alter ego of Navitas Energy and/or Gamesa Energia with respect to the MOU. It is also a successor and/or assignee with respect to the MOU. Mendota assumed Navitas Energy's rights and obligations under the MOU without notice to, or the consent of Micon USA and/or Micon A/S. Accordingly, Mendota is liable to Micon A/S for the breach of the MOU.

57.     Gamesa Energia also is responsible for any breach of the contract by Mendota because it and Mendota are alter egos of each other.

58.     Pursuant to the terms of the MOU, NAE, Navitas Energy, Mendota, and Gamesa Energia were obligated to use Micon A/S manufactured wind turbines for any power project arising out of the pre-development investigation.

- 14 -

59. By refusing to use Micon A/S manufactured wind turbines and instead using Gamesa Eolica for the supply of wind turbines at the Mendota Hills Site, NAE, Navitas Energy, Mendota, and Gamesa Energia breached their obligations to Micon A/S under the MOU.

60. NAE, Navitas Energy, Mendota, and Gamesa Energia have also breached the covenant of good faith and fair dealing which requires the parties to render performance in a manner that is within the reasonable expectations of the parties. Pursuant to the MOU, Micon USA agreed, as the agent of Micon A/S, that the data provided by the Princeton and Compton Met Stations could be used in pre-development activities and could be shared with others. However, by taking the data from the met stations and using that data in the development of a power project without using Micon A/S turbines, NAE, Navitas Energy, Mendota, and Gamesa Energia have breached the covenant of good faith and fair dealing.

61. As a result of NAE's, Navitas Energy's, Mendota's, and Gamesa Energia's breaches, Micon A/S has been damaged in an amount to be determined at trial.

WHEREFORE, Micon A/S prays that judgment be entered in its favor and against NAE, Navitas Energy, Mendota, and Gamesa Energia as follows:

a. Awarding Micon A/S compensatory damages suffered by it, including pre-judgment interest, in an amount to be determined at trial;

b. Awarding Micon A/S its reasonable costs and expenses, including attorney's fees, incurred in connection with this action; and

c. Awarding such other relief as the Court may deem just and proper.

## COUNT II

### BREACH OF CONTRACT - THIRD PARTY BENEFICIARY
### AGAINST NAE, NAVITAS ENERGY, MENDOTA, AND GAMESA ENERGIA

62. Micon A/S restates the allegations in paragraphs 1 to 61 for its paragraph 62.

63. The MOU is a valid and enforceable contract expressly entered into by Micon USA in its capacity as the agent of, and for the direct benefit of Micon A/S, with NAE. At the

time of contracting, NAE knew and intended that the MOU would directly benefit Micon A/S. Micon A/S is a third-party beneficiary of the MOU.

64. Micon USA and Micon A/S have performed all of their obligations under the MOU.

65. The MOU has been breached because defendants have proceeded with a project in northern Illinois arising out of the joint pre-development investigation without using Micon A/S turbines.

66. For the reasons stated above, NAE, Navitas Energy, Mendota and Gamesa Energia are all liable to Micon A/S for the breach of the MOU.

67. As a result of NAE's, Navitas Energy's, Mendota's, and Gamesa Energia's breaches, Micon A/S has been damaged in an amount to be determined at trial.

WHEREFORE, Micon A/S prays that judgment be entered in its favor and against NAE, Navitas Energy, Mendota, and Gamesa Energia as follows:

> a. Awarding Micon A/S compensatory damages suffered by it, including pre-judgment interest, in an amount to be determined at trial;
>
> b. Awarding Micon A/S its reasonable costs and expenses, including attorney's fees, incurred in connection with this action; and
>
> c. Awarding such other relief as the Court may deem just and proper.

## COUNT III

### TORTIOUS INTERFERENCE WITH CONTRACT
### AGAINST NAVITAS ENERGY

68. Micon A/S restates the allegations in paragraphs 1 to 67 for its paragraph 68.

69. In the alternative and if Navitas Energy is not found to be the alter ego and/or assignee and/or successor of NAE with respect to the MOU, then Navitas Energy tortiously interfered with the MOU.

70. Navitas Energy was aware of the MOU between Micon USA and NAE.

71.     Navitas Energy intentionally and unjustifiably induced NAE and/or Mendota to breach the MOU. Navitas Energy caused NAE and/or Mendota to ignore their obligations under the contract, particularly the obligation to make Micon USA the exclusive supplier of any wind turbines used at the Mendota Hills Site and to purchase wind turbines manufactured by Micon A/S.

72.     Navitas Energy induced NAE and/or Mendota to use Gamesa Eolica, instead of Micon A/S, as the supplier of wind turbines for the Mendota Hills Site.

73.     Micon A/S has been damaged by Navitas Energy's tortious interference with the MOU in an amount to be determined at trial.

WHEREFORE, Micon A/S prays that judgment be entered in its favor and against Navitas Energy as follows:

> a.      Awarding Micon A/S compensatory damages suffered by it, including pre-judgment interest, in an amount to be determined at trial;
>
> b.      Awarding Micon A/S its reasonable costs and expenses, including attorney's fees, incurred in connection with this action;
>
> c.      Awarding such other relief as the Court may deem just and proper.

## COUNT IV

## TORTIOUS INTERFERENCE WITH CONTRACT
## AGAINST MENDOTA

74.     Micon A/S restates the allegations in paragraphs 1 to 73 for its paragraph 74.

75.     In the alternative and if Mendota is not found to be the alter ego and/or assignee and/or successor with respect to the MOU, then Mendota tortiously interfered with the MOU.

76.     Mendota was aware of the MOU between Micon USA and NAE.

77.     Mendota intentionally and unjustifiably induced NAE and/or Navitas Energy to breach the MOU. Mendota caused NAE and/or Navitas Energy to ignore their obligations to Micon USA, particularly its obligation to make Micon USA the exclusive supplier of any wind

- 17 -

turbines used at the Mendota Hills Site, and to purchase wind turbines manufactured by Micon A/S.

78.     Mendota induced NAE and/or Navitas Energy to allow it to use Gamesa Eolica, instead of Micon A/S, as the supplier of wind turbines for the Mendota Hills Site.

79.     Micon A/S has been damaged by Mendota's tortious interference with the MOU in an amount to be determined at trial.

WHEREFORE, Micon A/S prays that judgment be entered in its favor and against Mendota as follows:

> a.     Awarding Micon A/S compensatory damages suffered by it, including pre-judgment interest, in an amount to be determined at trial;
>
> b.     Awarding Micon A/S its reasonable costs and expenses, including attorney's fees, incurred in connection with this action;
>
> c.     Awarding such other relief as the Court may deem just and proper.

## COUNT V

## TORTIOUS INTERFERENCE WITH CONTRACT
## AGAINST GAMESA ENERGIA

80.     Micon A/S restates the allegations in paragraphs 1 to 79 for its paragraph 80.

81.     In the alternative and if Gamesa Energia is not found to be an alter ego of Mendota with respect to the MOU, then Gamesa Energia tortiously interfered with the MOU.

82.     Gamesa Energia was aware of the MOU between Micon USA and NAE.

83.     Gamesa Energia intentionally and unjustifiably induced NAE and/or Navitas Energy and/or Mendota to breach the MOU. Gamesa Energia caused NAE and/or Navitas Energy and/or Mendota to ignore their obligations to Micon USA, particularly the obligation to purchase wind turbines manufactured by Micon A/S.

84.     Gamesa Energia induced NAE and/or Navitas Energy and/or Mendota to use Gamesa Eolica, instead of Micon A/S, as the supplier of wind turbines for the Mendota Hills Site.

85.     Micon A/S has been damaged by Gamesa Energia's tortious interference with MOU in an amount to be determined at trial.

WHEREFORE, Micon A/S prays that judgment be entered in its favor and against Gamesa Energia as follows:

a.      Awarding Micon A/S compensatory damages suffered by it, including pre-judgment interest, in an amount to be determined at trial;

b.      Awarding Micon A/S its reasonable costs and expenses, including attorney's fees, incurred in connection with this action;

c.      Awarding such other relief as the Court may deem just and proper.

## COUNT VI

### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE
### AGAINST NAVITAS ENERGY

86.     Micon A/S restates the allegations in paragraphs 1 to 85 for its paragraph 86.

87.     Micon A/S had a reasonable expectation of entering into a valid business relationship in connection with the development of a wind power project in northern Illinois. Navitas Energy was aware of Micon A/S's reasonable expectation.

88.     Navitas Energy unjustifiably interfered with Micon A/S's expectation by taking over the development of the wind power project in northern Illinois from NAE and refusing to use Micon A/S as the supplier of wind turbines to the project. Navitas Energy induced NAE to allow Navitas Energy to develop the project and to use Gamesa Eolica, instead of Micon USA, as the supplier of Micon A/S manufactured wind turbines for the Mendota Hills Site.

- 19 -

89.     Micon A/S has been damaged by Navitas Energy's tortious interference with

Micon A/S's prospective economic advantage in an amount to be determined at trial.

WHEREFORE, Micon A/S prays that judgment be entered in its favor and against
Navitas Energy as follows:

> a.     Awarding Micon A/S compensatory damages suffered by it, including pre-
> judgment interest, in an amount to be determined at trial;
>
> b.     Awarding Micon A/S its reasonable costs and expenses, including
> attorney's fees, incurred in connection with this action;
>
> c.     Awarding such other relief as the Court may deem just and proper.

## COUNT VII

### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE
### AGAINST MENDOTA

90.     Micon A/S restates the allegations in paragraphs 1 to 89 for its paragraph 90.

91.     Micon A/S had a reasonable expectation of entering into a valid business

relationship in connection with the development of a wind power project in northern Illinois.

Mendota was aware of Micon A/S's reasonable expectation.

92.     Mendota unjustifiably interfered with Micon A/S's expectation by taking over the

development of the wind power project in northern Illinois from NAE and/or Navitas Energy and

refusing to use Micon A/S as the supplier of wind turbines to the project. Mendota induced NAE

and/or Navitas Energy to allow Mendota to develop the project and to use Gamesa Eolica,

instead of Micon USA, as the supplier of Micon A/S manufactured wind turbines for the

Mendota Hills Site.

93.     Micon A/S has been damaged by Mendota's tortious interference with Micon

A/S's prospective economic advantage in an amount to be determined at trial.

WHEREFORE, Micon A/S prays that judgment be entered in its favor and against
Mendota as follows:

- 20 -

a.      Awarding Micon A/S compensatory damages suffered by it, including pre-judgment interest, in an amount to be determined at trial;

b.      Awarding Micon A/S its reasonable costs and expenses, including attorney's fees, incurred in connection with this action;

c.      Awarding such other relief as the Court may deem just and proper.

## COUNT VIII

### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE ECONOMIC ADVANTAGE
### AGAINST GAMESA ENERGIA

94.     Micon A/S restates the allegations in paragraphs 1 to 93 for its paragraph 94.

95.     Micon A/S had a reasonable expectation of entering into a valid business relationship in connection with the development of a wind power project in northern Illinois. Gamesa Energia was aware of Micon A/S' expectation.

96.     Gamesa Energia unjustifiably interfered with Micon A/S's expectation by taking over the development of the wind power project in northern Illinois from NAE and/or Navitas Energy and/or Mendota and refusing to use Micon A/S as the supplier of wind turbines to the project.  Gamesa Energia induced NAE and/or Navitas Energy and/or Mendota to allow Gamesa Energia to develop the project and to use Gamesa Eolica, instead of Micon USA, as the supplier of Micon A/S manufactured wind turbines for the Mendota Hills Site.

97.     Micon A/S has been damaged by Gamesa Energia's tortious interference with Micon A/S's prospective economic advantage in an amount to be determined at trial.

WHEREFORE, Micon A/S prays that judgment be entered in its favor and against Gamesa Energia as follows:

a.      Awarding Micon A/S compensatory damages suffered by it, including pre-judgment interest, in an amount to be determined at trial;

b.      Awarding Micon A/S its reasonable costs and expenses, including attorney's fees, incurred in connection with this action;

c.     Awarding such other relief as the Court may deem just and proper.

Plaintiff hereby demands a trial by jury on all issues.

Dated: February 4, 2005

Respectfully submitted,

VESTAS WIND ENERGY SYSTEMS A/S

By: _____

One of Its Attorneys

John M. Touhy
Edward H. Williams
Katherine M. Clark
Mayer, Brown, Rowe & Maw LLP
190 South LaSalle Street
Chicago, IL 60603-3441
(312) 782-0600
(312) 701-7711 -- Facsimile
Firm I.D. 38918

# EXHIBIT A

# MEMORANDUM OF UNDERSTANDING

THIS AGREEMENT made this ___21st___ day of ___October_____ 1999 by and between NEG Micon, a
Minnesota corporation ("NEG Micon") and Northern Alternative Energy, a Minnesota corporation
("NAE").

WHEREAS NEG Micon is a supplier of wind turbines and co-developer for power generation projects;

WHEREAS NAE is an independent developer of wind power projects;

NOW THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto
agree as follows:

1.  Pre-development Investigation. NEG Micon and NAE have agreed to jointly participate in a pre-
    development investigation of a wind power plant in northern Illinois. NEG Micon and NAE have
    retained the services of Tom Factor of the Iowa Wind Energy Institute to investigate candidate sites
    in northern Illinois. Tom Factor's services will begin in October of 1999. NEG Micon will provide
    an in-kind contribution of one fully equipment 50 meter met station and the labor to install and
    decommission the station at one candidate site. NAE will supply the equipment for one additional
    monitoring station on an existing communication tower at another candidate site. NAE will
    determine, control and compensate all activities of Tom Factor with regard to these pre-development
    activities. It is anticipated that this pre-development work will result in providing sufficient data
    necessary to substantiate wind power project proposal early in 2000.

2.  Project Proposal. It is the intent of NEG Micon and NAE to jointly propose a 31.5 megawatt wind
    power project consisting of 35 NEG Micon 900/52 wind turbines at the best candidate site in
    northern Illinois. The proposal would be presented to the newly established board of the $250
    million Illinois Clean Energy Trust sometime within the first quarter of 2000. Under this agreement
    NAE would be the project developer and owner and NEG Micon would be the exclusive supplier of
    the wind turbines for any project at both of above-mentioned candidate sites resulting out of the pre-
    development investigation.

3.  Confidentiality. Under this agreement NEG Micon and NAE will have joint access to all pre-
    development data provided by the Tom Factor and both wind monitoring stations. Both NEG Micon
    and NAE will be allowed to share all information associated with these pre-development activities
    with other parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their duly authorized officers or individuals.

NEG Micon

Signature: _____

Name: ANDRIS CUKURS

Title: PRESIDENT

Date: 21 - OCT - 99

NAE

Signature: _____

Name: GREGORY J JAWISH

Title: PRESIDENT

Date: 28 - OCT - 99

-7-

# EXHIBIT B

# ORIGINAL

*Execution Copy*

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement"), effective as of January 2, 2001, is by and between Navitas Energy, Inc., a Minnesota corporation (the "Buyer"), and Northern Alternative Energy, Inc., a Minnesota corporation (the "Seller").

WHEREAS, Seller is engaged in the business of developing and operating energy generation projects and provides related services (the "Business"); and

WHEREAS, Seller desires to sell and Buyer desires to purchase certain assets used in the Business, all upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the agreements herein, and for good and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1. Purchase and Sale of Assets.

   1.1   The Assets. Seller agrees to sell, assign, transfer, convey and deliver to Buyer on the Closing Date (as defined in Section 4), and Buyer agrees to purchase from Seller, for the Purchase Price (as defined in Section 3.1), the following assets of Seller (the "Assets"):

      (A)   The negotiating positions and bidding proposals of Seller as listed on Schedule 1.1(A), (the "Negotiating Positions"), including, but not limited to, that certain Negotiating Positions with Northern States Power Company for the development of wind and fuel-powered facilities (the "All Source Project");

      (B)   The ownership interests of Seller in those certain subsidiary corporations or companies as listed on Schedule 1.1(B) existing on the Closing Date (the "Subsidiary Interests");

      (C)   Except as set forth herein, all rights of Seller under the contracts, agreements, promissory notes, commitments and other arrangements, whether oral or written (the "Contracts"), as listed on Schedule 1.1(C) (collectively, the "Assumed Contracts");

      (D)   All patents, trademarks, copyrights, applications, tradenames, servicemarks, logos, licenses, domain names, technical data, product specifications, blueprints, know-how, trade secrets and other proprietary rights and intellectual property owned or used by the Seller, or to which Seller otherwise has rights, as listed on Schedule 1.1(D);

1292332/7

NAVITAS   004944

(E) All rights and interest of Seller in the employment agreements of Seller relating to the Business as of the Closing Date as listed on Schedule 1.1(E) (the "Employment Agreements");

(F) All rights and interest of Seller in the permits and licenses of Seller relating to the Assets as of the Closing Date as listed on Schedule 1.1(F) (the "Permits");

(G) All rights and interest of Seller in the real property as of the Closing Date as listed on Schedule 1.1(G) (the "Real Property");

(H) All rights and interest of Seller in the other personal property as of the Closing Date as listed on Schedule 1.1(H) (the "Other Property").

1.2 **Excluded Assets.** The rights and interest of Seller to any of its assets not expressly listed above in Section 1.1 or the schedules thereto shall be retained by Seller (the "Excluded Assets"), including, but not limited to, Seller's rights under this Agreement and the following:

(A) Any claims or potential claims under any insurance policy related to any of the Assets and which arise from any event, occurrence or circumstance which occurred prior to the Initial Closing so as to create a mature and ripe claim under the applicable policy as of that date;

(B) Any claims, actions, choses of action, demands or similar rights against any third party, including, but not limited to, any party to an Assumed Contract, which accrues or arises prior to the Initial Closing so as to create a fully matured and ripe cause of action against the applicable person as of that date;

(C) Any claims or rights to refunds of amounts paid on account of or related to any of the Assets, including any claim to refunds for prior tax payments, which are fully matured as of the Initial Closing.

2. **Liabilities.**

2.1 **Assumed Liabilities.** As part of the consideration for the purchase and sale of the Assets, Buyer will assume, and pay and satisfy as they become due, the following (the "Assumed Liabilities") at the Initial Closing for Assumed Liabilities transferred as of that date and each subsequent Closing Date for each respective Assumed Liability transferred thereafter:

(A) The liabilities and obligations of Seller under the Assumed Contracts, including the obligation of Seller under the notes payable listed on

2

NAVITAS 004945

Schedule 1.1(C), but not including any liability or obligation for any breach thereof occurring on or prior to the Closing Date;

(B)     Those certain accounts payable and accrued liabilities (the "Accounts Payable") of Seller relating to the Assets as of December 31, 2000 as listed on Schedule 2.1(B);

(C)     The liabilities and obligations of Seller under the Employment Agreements;

(D)     The liabilities and obligations of Seller under the Permits;

(E)     The liabilities and obligations of Seller under the Intellectual Property;

(F)     Four Hundred Thousand Dollars ($400,000), together with accrued interest thereon, of Seller's outstanding obligation under its Three Million Dollar ($3,000,000) revolving line of credit with National City Bank of Minneapolis (the "Credit Facility") relating to those certain assets purchased by Seller for Sibley Hills, LLC, which shall involve Buyer, prior to the Initial Closing, becoming a co-borrower under the Credit Facility; provided, however, that Seller shall indemnify, defend and hold Buyer harmless for any amounts required to be paid (or demands made by National City Bank of Minneapolis against Buyer under the Credit Facility) by Buyer under the Credit Facility above the $400,000 (plus accrued interest thereon) that Buyer hereby assumes under the Credit Facility.

(G)     The liabilities and obligation of Seller under those certain promissory notes made in favor of the Subsidiary Interests as listed on Schedule 2.1(G).

2.2     Excluded Liabilities. Buyer has no responsibility for, and Seller shall indemnify, defend and hold Buyer harmless from, any liabilities or obligations of Seller of any nature whatsoever which are not specifically included in the Assumed Liabilities identified in Section 2.1, whether similar or dissimilar to the Assumed Liabilities, whether now existing or hereafter arising, and whether known or unknown to Buyer or Seller (the "Excluded Liabilities"), including, without limitation, all of the following:

(A)     Liabilities or obligations arising out of an event that occurred, products sold or services performed by Seller, or Seller's ownership of its assets or the operation of the Business on or prior to, the Initial Closing for Assets transferred as of that date, and each subsequent Closing Date for each respective Asset transferred thereafter;

3

NAVITAS 004946

(B)    Liabilities and obligations of Seller for accrued audit fees, accrued commissions, accrued payroll (including associated employer taxes or employee withholdings), accrued insurance premiums, and garnishments payable of the Business incurred by Seller as of the Initial Closing;

(C)    Liabilities or obligations for foreign, federal, state, county, local or other governmental taxes of Seller relating to the operation of the Business or the ownership of the Assets arising or accruing on or prior to the Initial Closing;

(D)    Liabilities or obligations related to or arising out of any employee plan, workers' compensation claim or any other liabilities to employees or former employees of Seller arising or accruing prior to the Initial Closing;

(E)    Liabilities or obligations arising out of any litigation or administrative or arbitration proceeding to which Seller is a party or any claims by or against Seller arising from events or facts related to Assets and existing on or prior to the Closing Date;

(F)    Liabilities or obligations resulting from any breach by Seller on or prior to the Closing Date of any contract or agreement to which the Seller is a party or by which the Seller is bound, including, without limitation, any Assumed Contract;

(G)    Liabilities or obligations resulting from any violation by Seller, or any employee, director or agent of Seller, or any predecessor for which Seller may be liable, of any applicable foreign, federal, state, county, local or other governmental laws, decrees, ordinances or regulations, or any permit, license, consent, certificate, approval or authorization issued pursuant to such laws, decrees, ordinances or regulations, including, without limitation, those applicable to discrimination in employment, employment practices, wage and hour, retirement, labor relations, occupational safety, health, trade practices, environmental matters, competition, pricing, product warranties, product liability and product advertising;

(H)    Liabilities or obligations resulting from any breach by Seller of the Credit Facility on or prior to or subsequent to the Closing Date;

(I)    Liabilities or obligations arising out of the Credit Facility above the $400,000 (plus accrued interest thereon) that Buyer hereby assumes under the Credit Facility;

(J)    Liabilities or obligations resulting from any debt or obligation of Seller not assumed hereby; and

4

NAVITAS 004947

(K)     Seller's obligations under this Agreement.

3.     <u>Purchase Price</u>.

    3.1     <u>Price</u>. In exchange for the Assets, Buyer shall pay Seller $8,604,227 (the "Purchase Price"), of which $4,450,794 shall be paid by Buyer assuming Seller's obligations under the Assumed Liabilities as set forth in Section 2.1 hereof, and $4,153,433 (the "Cash Purchase Price"), which Purchase Price is subject to adjustment as set forth in Section 3.4 hereof.

    3.2     <u>Promissory Note</u>. The Cash Purchase Price paid to Buyer shall be evidenced by and subject to the terms, conditions, rights and privileges set forth in the Promissory Note (the "Promissory Note") attached hereto as Exhibit A. The parties shall also enter into a Security Agreement (the "Security Agreement") in substantially the form attached hereto as Exhibit B, which will provide Seller with a security interest in the Collateral (as defined in the Security Agreement), and which will provide that the secured party (that is, the Seller) shall subordinate its security interest in the collateral to the lenders of the All Source Project (as defined herein) to the extent required by such as determined in the sole discretion of such lenders, and which will provide that Seller shall release its security interest in the Collateral as reasonably demanded by such lenders. The Cash Purchase Price shall be delivered at Closing through the delivery of the Promissory Note and the Security Agreement.

    3.3     <u>Allocation of Purchase Price</u>. Buyer and Seller agree that the Assets are being sold and purchased at their fair market value. Therefore, the Purchase Price paid by the Buyer to the Seller in exchange for the Assets will been allocated by the parties on or prior to the Initial Closing and shall be reflected on a certificate at the Initial Closing (the "Closing Certificate"), and such allocation properly reflects the respective fair market value of each of the Assets. It is further agreed that the allocation of the consideration for the Assets as set forth on the Closing Certificate will be binding on both parties for federal income tax purposes and will be consistently so reflected by each party in their respective federal income tax returns. It is further agreed that the allocation of the Purchase Price shall be equitably adjusted in the event of any adjustment to the Purchase Price as set forth in Section 3.4 hereof.

    3.4     <u>Adjustment to Purchase Price</u>. The Purchase Price shall be subject to adjustment as follows:

       (A)     In the event that Buyer, at any time prior to January 3, 2006, shall have paid more than $400,000 (plus accrued interest thereon) to National City Bank of Minneapolis in the aggregate under the Credit Facility, Buyer may reduce the Purchase Price by the amount Buyer has paid or for which it has

5

NAVITAS   004948

received demand for payment under the Credit Facility in excess of $400,000 (plus accrued interest thereon), and seek indemnification from Seller as herein provided. If Buyer has paid or has received demand for payment under the Credit Facility in excess of $400,000 (plus accrued interest thereon) and the Purchase Price has been paid in full, Seller shall pay such amounts directly to Buyer upon the demand of Buyer.

(B)   In the event Seller, prior to December 31, 2001, is unable for any reason to obtain a consent from a third party acceptable to Buyer whose consent is determined by Buyer in a commercially reasonable manner to be necessary to transfer an Asset or Assumed Liability to Buyer, such Asset or Assumed Liability shall be retained by Seller and the Cash Purchase Price shall be adjusted as follows:

(i)   In the case of an Asset, the Cash Purchase Price shall be reduced by the value of the Asset not transferred to Buyer as determined by the allocation of Purchase Price as set forth in the Closing Certificate;

(ii)   In the case of an Assumed Liability, the Cash Purchase Price shall be increased by the value of the Assumed Liability not transferred to Buyer as determined by the allocation of Purchase Price as set forth in the Closing Certificate.

In the event of any adjustment to the Cash Purchase Price pursuant to this Section 3.4, Buyer and Seller hereby agree to amend the Promissory Note to reflect either the increase or the decrease in the Cash Purchase Price, as the case may be. In the event of any adjustment to the Purchase Price pursuant to this Section 3.4, the amount of such adjustment shall also be reflected on the allocation of the Purchase Price as set forth in the Closing Certificate.

4.   Closing. The consummation of the transactions contemplated by this Agreement (the "Closing") will take place at one or more closings (each, a "Closing" or, collectively, the "Closings") at such date(s) as may be mutually agreed upon by the Buyer and Seller at the offices of Lindquist & Vennum P.L.L.P., 4200 IDS Center, Minneapolis, Minnesota, or at such other location to which the Buyer and Seller mutually agree. Each such date is referred to herein as a "Closing Date." The first such Closing Date shall be February 28, 2001 (the "Initial Closing") or on such other date as the Buyer and Seller shall mutually agree. Subsequent Closings shall take place as the third party consents are obtained by Seller at such times and locations as the Buyer and Seller shall mutually agree.

NAVITAS   004949

5. **Representations and Warranties of Seller.** Seller represents and warrants to Buyer as follows:

5.1 **Organization.** Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Minnesota and has the requisite corporate power to own its properties and to carry on the Business as now being conducted. Seller has not failed to qualify as a foreign corporation in any other state or states where such failure may have a material adverse impact on the Business.

5.2 **Authorization.** Subject to any consents or approvals set forth in this Agreement, Seller has full power and authority to enter into and perform this Agreement. The execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated in this Agreement have been duly authorized by all requisite action of the Board of Directors and the shareholders of Seller. This Agreement has been executed and delivered by a duly authorized officer of Seller and is a valid and binding agreement of the Seller, enforceable against Seller in accordance with its terms, except as the enforceability of any such agreement may be limited by applicable bankruptcy, insolvency, reorganization or moratorium or other similar laws relating to the rights of creditors generally, and by general principles of equity.

5.3 **Consents and Approvals.** Except as set forth on Schedule 5.3, no consent, authorization, order or approval of or filing or registration with any governmental authority, and no material consent or authorization from any other entity or person, is required for the execution and delivery of this Agreement and the consummation by the Seller of the transactions contemplated by this Agreement, including without limitation, consents from parties to any Assumed Contract.

5.4 **No Violation.** Neither the execution and delivery of this Agreement, nor the consummation by the Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the articles of incorporation or bylaws of Seller, or the terms of any contract or other agreement or of any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any court or any governmental authority or of any arbitration award applicable to the Seller.

5.5 **Brokers.** Neither the Seller nor the Shareholders has used, and the making of this Agreement and the closing of the transactions contemplated in this Agreement will not give rise to, any obligation of Seller to pay any fee to, any broker, finder, agent or similar person.

5.6 **Financial Statements.** Seller has furnished Buyer with true and correct copies of the (i) audited financial statements of the Seller as of and for the year ended September 30, 2000 (the "Financial Statements"). The Financial Statements have

.7

NAVITAS 004950

been prepared in accordance with GAAP, consistently applied throughout the periods indicated, and present fairly the financial condition of the Seller as at the dates indicated and for the periods indicated in the Financial Statements, except as acknowledged in footnote disclosures.

5.7   Undisclosed Liabilities.  Seller has no liabilities (whether known or unknown, accrued, absolute, contingent or otherwise) that exist or arise out of any transaction or state of facts existing on or prior to each Closing Date other than as and to the extent reflected or reserved against in the Financial Statements (none of which is a liability for borrowed money (other than under current credit facilities), breach of contract, breach of warranty, tort, infringement or lawsuit), except for liabilities incurred in the ordinary course of business, none of which individually, or all of which collectively, constitute an adverse change in the financial condition or prospects of Seller.

5.8   No Adverse Changes.  Except as set forth on Schedule 5.8, there has not occurred (i) any material adverse change since September 30, 2000 in the Business, Assets, relationships with customers or suppliers, income, profit margins, assets, liabilities or financial condition of Seller; (ii) any condition, event, circumstance, fact or other occurrence, whether occurring before or since September 30, 2000 that may reasonably be expected to have or result in such a material adverse change; or (iii) any material damage, destruction or loss since September 30, 2000, whether or not covered by insurance, affecting any of the Assets or any portion of the Business other than wear and tear of any Assets incurred in the ordinary course of their appropriate use in the Business.

5.9   Subsidiary Interests.  Except as set forth on Schedule 5.9, all Subsidiary Interests transferred by Seller are owned by Seller free of encumbrance.

5.10  Credit Facility.  Except as set forth on Schedule 5.10, no default or event exists which, with notice or lapse of time or both, would constitute a default by Seller under the Credit Facility and there are no events, conditions, circumstances which might reasonably result in the termination of the Credit Facility because of Buyer becoming a co-borrower thereunder.  Seller shall use commercially reasonable efforts to comply with the terms and conditions of the Credit Facility, and to make all required payments when due.  Seller further represents that Seller shall be liable to Buyer for any obligation incurred by Buyer under the Credit Facility above the $400,000 (plus accrued interest thereon) that Buyer hereby agrees to pay under the Credit Facility.

5.11  Negotiating Positions.  All of the Negotiating Positions transferred by Seller are transferable and all consents necessary to effect such transfers have been obtained by Seller as of the Closing Date and to the best of the Seller's knowledge there are no events, conditions or circumstances which might reasonably result in the

NAVITAS   004951

termination of any current negotiations involved in the Negotiating Positions because of the transfer of Seller's Negotiating Position to Buyer.

5.12    Intellectual Property.  Schedule 1.1(D) sets forth a complete list of all patents, trademarks (whether registered or unregistered), trade names, domain names, service marks, copyrights, applications therefor and other intellectual property (collectively, "Intellectual Property") to be transferred by Seller to Buyer.  The Seller has not received any notice or claim that Seller's title to or use of the Intellectual Property is impaired, encumbered or invalid or is unenforceable by it. Seller's use of any item of the Intellectual Property does not infringe upon any intellectual property rights held by any other person or entity, and there is no claim or action pending or threatened with respect to the Intellectual Property. There has been no infringement or improper use of any item of Intellectual Property by any third party.

5.13    Title.  Except as listed on Schedule 5.13, Seller has good and marketable title to all of the Assets free and clear of any lien, security interest, mortgage, pledge or other encumbrance of any kind (collectively, "Encumbrances").

5.14    Contracts.

    (A)    Schedule 1.1(C) lists each contract and agreement, whether oral or in writing, excluding purchase orders, to which Seller is a party or is otherwise bound, which shall be assumed by the Buyer.

    (B)    Each of the Assumed Contracts are in full force and is binding upon and enforceable against the parties to each contract, except as such enforceability may be limited by the effect of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditor rights generally or by general principles of equity.  Except as set forth on Schedule 5.14, no default, or event which with notice or lapse of time or both would constitute a default by Seller or by the other contracting parties, has occurred under any of the Assumed Contract or will occur as a result of Seller's execution and delivery of this Agreement or consummation of the transactions contemplated by this Agreement.

5.15    Permits.  Schedule 1.1(F) sets forth a complete list of the all Permits owned by, used by, or accruing to the benefit of the Seller with respect to the Assets.  All of the Permits transferred by Seller are transferable and all consents from the applicable governmental authorities necessary to effect such transfers will have been obtained by Seller as of the applicable Closing.

5.16    Litigation and Compliance with Certain Laws.  There are no claims (including, without limitation, workers' compensation claims), action, suits, inquiries, investigations, or proceedings pending or to the best of Seller's knowledge,

9

NAVITAS 004952

threatened or imminent, relating to the Seller, the Assets, any of the Assumed Liabilities or the transactions contemplated by this Agreement, and, to the best knowledge of Seller, there is no basis for any such claim, action or proceeding. To the best of Seller's knowledge, Seller has complied in all material respects with all statutes, laws and regulations, orders and decrees applicable to it, the Business, the Assets, the Assumed Liabilities or the transactions contemplated by this Agreement.

5.17    Tax Matters.  Seller has no current knowledge of, and shall remain responsible for the payment of, any unpaid federal, state or local income, franchise, sale or use or other taxes owed by the Seller which could become an Encumbrance on any Asset.  Seller has received no notice of any impending audit by any taxing authority. Seller has received no notice of any tax deficiency proposed or assessed against it, and it has not executed any waiver of any statute of limitations on the assessment or collection of any tax.

5.18    Copies of Documents.  Copies of all underlying documents listed or described on any Schedule have been delivered to Buyer or Buyer's attorneys.   All such documents are true, complete and correct copies, and there are no amendments or modifications thereto, except as specifically noted on the Schedule on which such document is referenced.

5.19    Intentionally omitted.

5.20    Adequacy of Representations.  None of the representations and warranties made by Seller in this Agreement contains any untrue statement of a material fact or omits to state a material fact in order to make the statements contained herein not misleading.

5.21    Stock Option Agreements.  The current stock option agreements of Seller are listed on Schedule 5.21 ("Seller's Stock Option Agreements").  All of Seller's Stock Option Agreements have been delivered to Buyer for review and there has been no change, modification or amendment to the Seller's Stock Option Agreements since such date of delivery to Buyer.

5.22    Real Property.  Seller owns the Real Property listed on Schedule 1.1(G), free and clear of all encumbrances except for the encumbrances described on Schedule 5.22 (the "Permitted Encumbrances"), Seller has received no notice of actual or threatened special assessments or reassessments of the Real Property. To the best of Seller's belief and knowledge there are no conditions on the Real Property which would constitute violation of any state of federal environmental laws which will require remediation under any environmental laws prior to the transfer of title to the Real Property from Seller to Buyer.

10

NAVITAS  004953

5.23 <u>Accounts Payable</u>. Schedule 2.1(B) is a true and complete list of all Accounts Payable relating to the Assets transferred hereby as of December 31, 2000. Seller has no other liability or obligation relating to the Assets transferred hereby.

5.24 <u>Financial Condition</u>. Neither Seller nor any of its subsidiaries has filed any voluntary petition in bankruptcy or been adjudicated as bankrupt or insolvent, filed any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any federal institute bankruptcy act, insolvency or other debtor relief law, or sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator of all or any substantial part of their respective properties. After all Closings scheduled to occur under this Agreement, and the completion of all conveyances and transactions contemplated by this Agreement, Seller shall be solvent and capable of meeting all liabilities and obligations incurred or expected to arise in the course of the Business. Seller shall deliver to Buyer a Solvency Certificate attested to by an appropriate officer of Seller, in form and substance reasonably acceptable to Buyer.

5.25 <u>Investment Company; PUHCA</u>. Seller is not subject to regulation as an "investment company" within the meaning of the Investment Company Act of 1940 and is not an "investment advisor" within the meaning of the Investment Company Act of 1940. Seller is not a "public utility company" or a "holding company' within the meaning of the Public Utility Holding Company Act of 1935 and is not otherwise subject to regulation under PUHCA.

5.26 <u>Due Diligence</u>. Seller acknowledges that it (i) is represented by competent legal, tax and financial counsel in connection with the negotiation, execution and delivery of this Agreement; (ii) together with its affiliates, has sufficient knowledge and experience in developing, using, managing and operating electric generating facilities so as to enable it to evaluate the Assets and the Assumed Liabilities, including the value of each of the Assets and Assumed Liabilities as well as the technical, commercial, legal, regulatory, and other risks associated with its sale of the Assets and the transfer of the Assumed Liabilities; (iii) has performed the due diligence it considers necessary to enter into and perform the Agreement, independent of and notwithstanding any of Buyer's representation and warranties; and (iv) has had full opportunity to request, receive and review all financial and other information and data deemed necessary to inform its judgment as to execution and performance of this Agreement.

6. <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller as follows:

6.1 <u>Corporate Existence</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Minnesota and has the requisite corporate power to own its properties and to carry on its business as now being conducted.

11

NAVITAS    004954

6.2 <u>Authorization</u>. Buyer has all necessary power and authority to enter into and perform this Agreement. The execution and delivery of this Agreement by Buyer and the consummation of the transactions contemplated by this Agreement have been duly authorized by all requisite corporate action of Buyer. This Agreement has been executed and delivered by a duly authorized officer of Buyer and is a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except as the enforceability of any such agreement may be limited by applicable bankruptcy, insolvency, reorganization or moratorium or other similar laws relating to the rights of creditors generally, and by general principles of equity.

6.3 <u>Stock Options</u>. Buyer shall issue stock option agreements effective as of the date of this Agreement to the Seller's current holders of stock option agreements upon similar terms and conditions as such Seller's Stock Options Agreement set forth on Schedule 5.21 currently contain.

6.4 <u>No Violation</u>. Neither the execution and delivery of this Agreement, nor the consummation by the Buyer of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, of any contract or other agreement or of any statute or administrative regulation, or of any order, writ, injunction, judgement or decree of any court or any governmental authority or of any arbitration award applicable to the Buyer.

6.5 <u>Brokers</u>. Buyer has not used, and the making of this Agreement and the closing of the transactions contemplated in this Agreement will not give rise to any obligation of Buyer to pay any fee or other consideration to, any broker, finder, agent or similar person.

6.6 <u>Credit Facility</u>. There are no events, conditions, circumstances which might reasonably result in the termination of the Credit Facility because of Buyer becoming a co-borrower thereunder. Buyer shall use commercially reasonable efforts to comply with the terms and conditions of the Credit Facility, and to make all required payments when due.

6.7 <u>Consents and Approvals</u>. No consent, authorization, order or approval of or filing or registration with any governmental authority, and no material consent or authorization from any other entity or person, is required for the execution and delivery of this Agreement and the consummation by the Buyer of the transactions contemplated by this Agreement.

6.8 <u>Litigation</u>. There are no actions, suits, arbitrations, or administrative or other proceedings, at law or in equity, now pending and, to the best of the Buyer's knowledge, no event has occurred and no circumstance exists that would reasonably be expected to serve as the basis for such action, suit, arbitration or

12

NAVITAS 004955

administrative or other proceeding, that could be expected to have a material adverse effect on the ability of Buyer to perform its obligations hereunder or to otherwise consummate the transactions and conveyances contemplated by this Agreement.

6.9     Financial Condition.   Neither Buyer nor any of its subsidiaries has filed any voluntary petition in bankruptcy or been adjudicated as bankrupt or insolvent, filed any petition or answer seeking any reorganization, liquidation, dissolution or similar relief under any federal institute bankruptcy act, insolvency or other debtor relief law, or sought or consented to or acquiesced in the appointment of any trustee, receiver, conservator or liquidator of all or any substantial part of their respective properties. After all Closing scheduled to occur under this Agreement, and the completion of all conveyances and transactions contemplated by this Agreement, Buyer shall be solvent and capable of meeting all liabilities and obligations incurred or expected to arise in the course of the Business.

6.10    Due Diligence.   Buyer acknowledges that it (i) is represented by competent legal, tax and financial counsel in connection with the negotiation, execution and delivery of this Agreement; (ii) together with its affiliates, has sufficient knowledge and experience in developing, using, managing and operating electric generating facilities so as to enable it to evaluate the Assets and the Assumed Liabilities, including the value of each of the Assets and Assumed Liabilities as well as the technical, commercial, legal, regulatory, and other risks associated with its purchase and ownership of the Assets and assumption of the Assumed Liabilities; (iii) has performed the due diligence it considers necessary to enter into and perform the Agreement, independent of and notwithstanding any of Seller's representation and warranties; and (iv) has had full opportunity to request, receive and review all financial and other information and data deemed necessary to inform its judgment as to execution and performance of this Agreement.

6.11    Investment Company; PUHCA.   Buyer is not subject to regulation as an "investment company" within the meaning of the Investment Company Act of 1940 and is not an "investment advisor" within the meaning of the Investment Company Act of 1940.   Buyer is not a "public utility company" within the meaning of the Public Utility Holding Company Act of 1935 and is not otherwise subject to regulation under PUHCA.

6.12    Purchase of Stock and Membership Interests.   The membership interests and stock comprising part of the Assets shall be acquired by the Buyer for its own account for the purpose of investment, it being understood that the right to dispose of such securities shall be entirely within the discretion of the Buyer.   Buyer shall refrain from transferring or disposing of any such securities or any interest therein in such manner as to cause Seller to be in violation of the registration requirements of the Securities Act of 1933, as amended or applicable state securities or blue sky laws.

13

NAVITAS   004956

7. <u>Conditions Precedent to Obligations of Seller and Shareholders</u>. The obligations of Seller under this Agreement are subject to fulfillment prior to or at the Closing of each of the following conditions, unless waived in writing by Seller:

7.1 <u>Representations and Warranties</u>. Each of the representations and warranties made by Buyer in this Agreement or in any instrument, schedule, certificate or writing delivered by Buyer pursuant to this Agreement, shall be true and correct when made and shall be true and correct at and as of the Closing Date as though such representation and warranties were made or given on and as of the Closing Date. Buyer shall have performed or complied with all obligations and covenants required by this Agreement to be performed or complied with by Buyer by the Initial Closing and each Closing Date.

7.2 <u>Absence of Certain Legal Proceedings</u>. No suit or other legal proceeding shall have been commenced seeking to restrict or prohibit the transactions contemplated by this Agreement.

7.3 <u>Other Matters</u>. Buyer shall have delivered the documents required under Section 9.1.

7.4 <u>Credit Facility</u>. Buyer shall be current on all of its obligations under the Credit Facility.

7.5 <u>Shareholder Approval</u>. Seller shall have obtained the approval to this Agreement of a majority of the Seller's outstanding voting power.

8. <u>Conditions Precedent to Obligations of Buyer</u>. The obligations of Buyer under this Agreement are subject to fulfillment prior to or at each Closing of each of the following conditions, unless waived in writing by Buyer:

8.1 <u>Representations and Warranties</u>. Each of the representations and warranties made by Seller in this Agreement, or in any instrument, schedule, certificate or writing delivered by Seller pursuant to this Agreement, shall be true and correct when made and as of the Initial Closing and each subsequent Closing Date. Seller shall have performed or complied with all obligations and covenants required by this Agreement to be performed or complied with by Seller by the applicable Closing Date.

8.2 <u>Absence of Certain Legal Proceedings</u>. No suit or other legal proceeding shall have been commenced seeking to restrict or prohibit the transactions contemplated by this Agreement.

8.3 <u>Due Diligence Review</u>. Buyer shall have completed its due diligence review of the Assets of Seller and the Assumed Liabilities, with results satisfactory to Buyer, in its sole discretion. This condition shall be deemed satisfied unless Buyer notifies

14

NAVITAS 004957

{               {

Seller prior to January 29, 2001 that it has not been satisfied and that Buyer desires to terminate this Agreement as a result of the failure of this condition.

8.4    Other Matters.  Seller shall have delivered the documents required under Section 9.2.

8.5    Approvals.    All required approvals or consents shall have been obtained by Seller prior to the transfer of a particular Asset or Assumed Liability to Buyer, including, but not limited to, the consent from National City Bank of Minneapolis pursuant to the Credit Facility, which shall be obtained prior to the Initial Closing.

9.    Closing Documents.

9.1    Buyer's Deliveries.  At the Initial Closing, Buyer shall execute and/or deliver to Seller the following:

(A)    the Promissory Note to Seller as provided in Section 3.2;

(B)    the Security Agreement as provided in Section 3.2;

(C)    a Certificate of Good Standing from the Secretary of State of the State of Minnesota;

(D)    a certificate of an officer of Buyer certifying as to a copy of the resolutions of the Buyer's Board of Directors which authorize the execution, delivery and performance of this Agreement as having been duly adopted and as being in full force and effect on the Initial Closing Date;

(E)    a Bill of Sale, Assignment and Assumption Agreement in the form of Exhibit 9.1(E) with respect to the Assets and Assumed Liabilities to be transferred to Buyer at the Closing; and

(F)    The Closing Certificate as provided in Section 3.3.

9.2    Seller's Deliveries.  At the Initial Closing and at each subsequent Closing, Seller shall deliver to Buyer physical possession of all Assets transferred at such Closing and shall execute (where applicable in recordable form) and/or deliver to Buyer all of the following:

(A)    a certificate of an officer of Seller certifying as to:

(1)    a copy of the resolutions of Seller's Board of Directors authorizing the execution, delivery and performance of this Agreement as having been duly adopted and as being in full force and effect on the Closing Date; and

15

NAVITAS   004958

(2)     a copy of the articles of incorporation and bylaws of Seller as in effect on the Closing Date;

(B)     a Certificate of Good Standing from the Secretary of State of the State of Minnesota;

(C)     the Bill of Sale, Assignment and Assumption Agreement;

(D)     The Closing Certificate as provided in Section 3.3;

(E)     all necessary consents for the assignment to Buyer of the Assumed Contracts;

(F)     Certificate of Officer of Seller certifying that the approval of Seller's shareholders to this Agreement has been obtained;

(G)     The Security Agreement as provided in Section 3.2;

(H)     A warranty deed and related conveyancing instruments necessary to transfer the Real Property to Buyer;

(I)     Consents of its employees to assignment of each of the Employment Agreements, provided that Seller may require, together with each consent, a release of claims by each such employee; and

(J)     The Solvency Certificate as provided in Section 5.24.

10.     <u>Post-Closing Agreements</u>.

10.1     <u>Post-Closing Agreements</u>. From and after the Closing, the parties shall have the respective rights and obligations set forth in this Section 10 as well as any other rights and obligations contained in this Agreement.

10.2     <u>Third Party Claims</u>. The parties shall cooperate with each other with respect to the defense of any claims or litigation made or commenced by third parties which are not subject to the indemnification provisions contained in Section 11; provided that the party requesting cooperation must promptly reimburse the other party for the other party's reasonable out-of-pocket costs and expenses of furnishing such cooperation.

10.3     <u>Further Assurances</u>. The parties shall execute such further documents, and perform such further acts, as may be necessary to transfer and convey the Assets and Assumed Liabilities to Buyer and for Buyer to assume the Assumed Liabilities, on the terms contained in this Agreement, and to otherwise comply

16

NAVITAS   004959

with the terms of this Agreement and consummate the transactions provided in this Agreement.

10.4 <u>Certain Tax Matters</u>. Seller shall file all income tax returns of Seller or which relate to the Business with respect to all taxable periods prior to and including the Closing Date, and pay all income taxes with respect to such periods unless Seller is disputing such taxes in good faith (and reasonably pursuing resolution thereof).

10.5 <u>Agreement Regarding Confidentiality</u>. Except as required by law after reasonable notice to the other party, each party must not (and must exercise such control and influence as it is in a position to exercise to cause its affiliates, directors, officers, employees, representatives, and agents not to) disclose to any person or entity any trade secret, process, know-how, business strategies or plans, prices, customers or customer lists, finances, costs, marketing plans, or any other information relating to the Assets, Assumed Liabilities or the Business that was not, prior to such disclosure, a matter of public knowledge.

11. <u>Survival and Indemnification</u>.

11.1 <u>Survival</u>. The representations, warranties, covenants and indemnification provisions contained in this Agreement, and in any certificate delivered pursuant to this Agreement at the Closing, will survive the Closing.

11.2 <u>Buyer's Indemnification Covenants</u>. Buyer shall indemnify Seller from and against all liability, demands, claims, actions or causes of action, assessments, losses, fines, penalties, costs, damages and expenses, including reasonable attorneys' fees and disbursements incurred in connection therewith and in seeking indemnification therefor, sustained or incurred by Seller as a result of or arising out of or by virtue of:

   (A) any inaccuracy in a representation or warranty made by Buyer to Seller in this Agreement;

   (B) the failure of Buyer to comply with, or the breach by Buyer of, any of the covenants in this Agreement to be performed by Buyer;

   (C) the failure of Buyer to perform any of the Assumed Liabilities after the Closing Date on which each of them is transferred and conveyed to Buyer, or any breach of contract or any other claim arising out of any of the Assets after the Closing Date on which each of them is transferred and conveyed to Buyer;

   (D) the failure of Buyer to perform or satisfy any of its obligations under the Credit Facility, including, but not limited to, Buyer's failure to pay the

17

NAVITAS 004960

$400,000 obligation, with related interest and fees, it assumes with respect to Sibley Hills; and

(E) any costs and expenses associated with defending against any of the foregoing claims, liabilities, obligations, costs, damages, losses and expenses.

11.3    Seller's Indemnification Covenants. Seller shall indemnify Buyer, its affiliates, successors and assigns from and against all liability, demands, claims, actions or causes of action, assessments, losses, fines, penalties, costs (including investigation and remediation costs), damages and expenses, including reasonable attorneys' fees and disbursements incurred in connection therewith and in seeking indemnification therefor, sustained or incurred by the Buyer, its affiliates, successors or assigns (collectively, "Losses" or, individually, a "Loss") as a result of or arising out of or by virtue of:

(A) any inaccuracy in a representation or warranty made by Seller to Buyer in this Agreement;

(B) the failure of Seller to comply with, or the breach by Seller of, any of the covenants in this Agreement (excluding the representations and warranties under Section 5) to be performed by Seller;

(C) Seller's failure to honor, discharge, pay or fulfill when due any Excluded Liability;

(D) any amounts required to be paid (or demands made by National City Bank of Minneapolis against Buyer under the Credit Facility) by Buyer under the Credit Facility above the $400,000 (plus accrued interest thereon) that Buyer hereby assumes under the Credit Facility;

(E) claims of Seller's creditors under any applicable bulk sales law in connection with the transactions contemplated by this Agreement; and

(F) any costs and expenses associated with defending against any of the foregoing claims, liabilities, obligations, costs, damages, losses and expenses.

11.4    Subrogation. Any party obligated to provide indemnification (the "Indemnifying Party") shall not be entitled to require that an action be brought against anyone else before action is brought against it under this Agreement by the party being indemnified under this Agreement ("Indemnified Party") and shall not be subrogated to any right of action until it has paid in full or successfully defended against the claim for which indemnification is sought or has acknowledged

18

NAVITAS  004961

( (

without qualification its indemnification obligations under this Section 11 in writing to the Indemnified Party.

11.5    Notice and Opportunity to Defend.  Promptly after the receipt by any party of notice of any claims or the commencement of any action or proceeding by a third party, such party to this Agreement will, if a claim with respect thereto is to be made against an Indemnifying Party, pursuant to Section 11.2 or 11.3, give the Indemnifying Party written notice of such claim or the commencement of such action or proceeding.  In the case of a claim asserted by a third party, such Indemnifying Party has the right, at its option to compromise or defend, at its sole expense and by counsel satisfactory to the Indemnified Party, any such matter involving the asserted liability of the party seeking such indemnification so long as such settlement does not include any admission of liability on the part of the Indemnified Party or the assumption of any obligation by such Indemnified Party not paid for in full by the Indemnifying Party.  If any Indemnifying Party undertakes to compromise or defend any such asserted liability, it must promptly notify the party seeking indemnification of its intention to do so, and the party seeking indemnification agrees to reasonably cooperate with the Indemnifying Party and its counsel in the compromise of, or defense against, any such asserted liability.  In this event, the Indemnified Party and Indemnifying Party each have the right to participate in the settlement and defense of such asserted liability and to approve any compromise or settlement, which approval shall not be unreasonably withheld.  The Indemnifying Party shall pay the Indemnified Party on demand the full amount of any sum which is indemnifiable and shall not, with respect thereto, permit to exist a lien upon any asset of the Indemnified Party or of its subsidiaries or affiliates.

12.    Miscellaneous.

12.1    Termination.  Notwithstanding any provision in this Agreement to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, at any time on or prior to the Initial Closing: (i) by mutual written consent of Buyer and Seller; (ii) by Buyer if any of the conditions set forth in Section 8 have not been satisfied, or waived in writing by Buyer; (iii) by Seller if any of the conditions set forth in Section 7 have not been satisfied, or waived in writing by Seller; or (iv) by either Buyer or Seller if the Initial Closing does not occur on or prior to March 31, 2001, but only if, prior to that date, the party requesting termination used all reasonable efforts and acted in good faith to close the transactions contemplated by this Agreement and to satisfy all conditions precedent to the closing of these transactions.  If Buyer or Seller desires to terminate this Agreement pursuant to this Section, that party must give written notice to the other party.  Upon receipt of that notice, this Agreement will be terminated without further action by any party.  Nothing contained in this Section 12.1 will release any party from any liability for any breach by such party of any of the terms or provisions of this Agreement or impair the right of any party to

19

NAVITAS    004962

compel specific performance by another party of its obligations under this Agreement.

12.2 Expenses and Transfer Taxes. All fees and expenses incurred by Seller in connection with this Agreement shall be borne by Seller and those fees and expenses are deemed to be part of the Excluded Liabilities. All fees and expenses incurred by Buyer in connection with this Agreement shall be borne by Buyer. Seller shall pay all sales, transfer taxes and other transfer fees which may be payable by Seller in order to effectuate the transfer of the Assets contemplated by this Agreement, but shall not be obligated to pay any taxes incurred by Buyer as a result of the transactions. Buyer shall not be obligated for any taxes incurred by Seller as a result of the transactions.

12.3 Notices. All notices required or permitted to be given under this Agreement must be in writing and will be deemed given when delivered in person, or three business days after being deposited in the United States mail, postage prepaid, registered or certified mail, addressed as set forth below or on the next business day after being deposited with a nationally recognized overnight courier service addressed as set forth below or upon dispatch if sent by facsimile with telephonic confirmation of receipt from the intended recipient to the telefax number set forth below:

If to Seller addressed to:

Northern Alternative Energy, Inc.
3001 Broadway Street, Suite 695
Minneapolis, MN 55413
Fax No.: 612-370-9005

With a copy to:

Jeffrey C. Paulson
Hammargren, Meyer & Paulson
7301 Ohms lane, Suite 360
Minneapolis, MN 55349
Fax No.: 952-844-0114

If to Buyer addressed to:

Navitas Energy, Inc.
3001 Broadway Street, Suite 695
Minneapolis, MN 55413
Fax No.: 612-370-9005

With a copy to :

20

NAVITAS   004963

Girard P. Miller
Lindquist & Vennum P.L.L.P.
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Fax No.: 612-371-3207

and/or to such other respective addresses as may be designated by notice given in accordance with the provisions of this Section 12.3 except that any notice of change of address will not be deemed given until actually received by the party to whom directed.

12.4   Third Parties.   Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any other person other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor does any provision give any third party any right of subrogation or actions over or against any party to this Agreement. This Agreement is not intended to and does not create any third party beneficiary rights whatsoever.

12.5   Schedules and Exhibits.   The Schedules and Exhibits attached to this Agreement are incorporated into this Agreement by reference and are part of this Agreement.

12.6   Entire Agreement.   This Agreement and the Schedules and Exhibits attached to this Agreement constitute the entire agreement between the parties and is binding upon and inures to the benefit of the parties and their respective legal representatives, successors and assigns.

12.7   Assignment.   This Agreement is not assignable by any party.

12.8   Non-Waiver.   The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege conferred by this Agreement, or the waiver by any party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

12.9   Modification.   This Agreement may only be amended or modified in writing signed by all of the parties.

21

NAVITAS   004964

12.10 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which is deemed to be an original, and all such counterparts constitute but one instrument.

12.11 <u>Severability</u>. The invalidity of any provision of this Agreement or portion of a provision shall not affect the validity of any other provision of this Agreement or the remaining portion of the applicable provision.

12.12 <u>Headings</u>. The descriptive headings in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

12.13 <u>Draftsman</u>. Buyer and Seller acknowledge that this Agreement has been drafted with material input by Buyer's and Seller's respective legal counsel and Buyer and Seller agree that this Agreement shall not be interpreted against any party deemed to be the drafting party of this Agreement.

12.14 <u>Applicable Law; Venue</u>. All questions concerning the validity, operation, enforceability, interpretation, construction, and effect of this Agreement shall be governed by, and determined in accordance with, the internal laws of the state of Minnesota without regard to the conflicts of law provisions of any jurisdiction. Any litigation between the parties hereto arising under this Agreement shall be venued in a United States Federal court or a Minnesota State court, in either case, located in Minneapolis, Minnesota, and the Seller and Buyer hereby consent to the personal jurisdiction of any such court.

12.15 <u>Non-Exclusivity</u>. The rights, remedies, powers and privileges provided in this Agreement are cumulative and not exclusive and are in addition to any and all rights, remedies, powers and privileges granted by law, rule, regulation or instrument.

22

NAVITAS   004965

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement effective as of the day and year first above written.

SELLER:

NORTHERN ALTERNATIVE ENERGY, INC.

By _____
Its _____

BUYER:

NAVITAS ENERGY, INC.

By _____
Its _____

23

SCHEDULE 1.1(A)
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001

## NEGOTIATING POSITIONS

1.     Seller is currently negotiating with Northern States Power Company ("NSP") for one or more power purchase agreements (the "All Source Agreements") involving the development of up to 550 MWs of electric energy generated by gas turbines and up to 100 MWs of electricity generated by wind turbine technology.

2.     Seller is currently negotiating the terms of a power purchase agreement with Commonwealth Edison ("ComEd"), pursuant to a letter of intent, for the development of a 31.5 MW wind project to be located in Illinois.

3.     Seller has submitted a bid pursuant to a request for proposals ("RPR") from NSP for the development of an 80 MW wind energy project to be located in Minnesota.

4.     Seller has submitted a bid pursuant to a RPR from MinnKota Power for the development of a 2 MW wind energy project to be located in North Dakota.

5.     Seller has submitted a bid pursuant to a RPR from Municipal Energy Agency of Nebraska for the development of a 30 MW project to be located in Nebraska.

Doc# 129212646

NAVITAS 004967

SCHEDULE 1.1(B)
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001

## SUBSIDIARY INTERESTS

1.   4,750,000 shares of the Common Stock of EZWatt.com, Inc., which constitutes 95% of the outstanding capital stock. EZWatt.com, Inc. has one employee who will continue to be employed by EZWatt  EZWatt has developed and Internet portal for the sale of energy and owns the domain name "EZWatt.com."

2.   1000 shares of Common Stock of Navitas, Inc., which constitutes all of the outstanding capital stock.  Navitas, Inc. has been issued a license from FERC as a direct marketer of energy.  This company has applied for several trademark relating to the name "Navitas" and will assign such trademark applications to Buyer.

3.   1000 shares of the Common Stock of Green Junction.com, Incorporated, which constitutes all of the outstanding capital stock.

4.   The 99.99 membership interest in Northern Alternative Energy Shaokatan, LLC ("NAE Shaokatan") which is a company that is the management agent for two wind farms on the Buffalo Ridge in southwestern Minnesota (Shaokatan Hills, LLC and Lakota Ridge, LLC) in which Northern Alternative Energy Shaokatan, LLC has a .1% investment in each entity and an option to purchase the membership interests of the other members.  NAE Shaokatan owns the land, comprising approximately 532 acres in Lincoln County, Minnesota, on which these two projects operate.  In connection with NAE's construction of the Visitor's Center, NAE Shaokatan granted a mortgage on its real property in favor of the Small Business Administration ("SBA") to secure NAE's repayment of the loan  from the SBA.  The real property is subject to thirty-year ground leases with Lakota Ridge, LLC and Shaokatan Hills, LLC, each dated September 9, 1998.  NAE Shaokatan has management agreements with Lakota Ridge, LLC and Shaokatan Hills, LLC, each dated September 9, 1998.

5.   The 99.99 membership interest in Northern Alternative Energy Sibley, LLC ("NAE Sibley") which is a company that currently manages, but does not own a Micon 600 kilowatt wind turbine on land in Sibley, Iowa.  NAE Sibley  will continue to be responsible for the note with First Minnesota Bank, N.A., dated December 16, 1996, with installments of $7,144, due December 2011.  The balance on 12/31/00 was $529,758.

6.   The 99.99 membership interest in Northern Alternative Energy Allendorf, LLC ("NAE Allendorf") which is a company that currently manages and owns a 600 kilowatt wind turbine in Iowa.  NAE Allendorf  will continue to be responsible for the note with Heritage State Bank, dated April 15, 1997.  A portion of the funds for the loan was provided by the Iowa Energy Center. This portion of the

Doc# 129212646

loan is not interest bearing and requires installments of $1,389, due September 2. The balance on the interest free portion of the loan as of December 31, 2000 is $105,000. The remaining funds advanced under the note bears an interest rate of 3.5%over prime. This portion of the rate requires installments of $4,802, due September 2001. The balance due on this part of the loan as of December 31,2000 is $363,961.

7.　　　The 100% membership interest in Sibley Hills, LLC, which is a recently organized business that has finalized a power purchase agreement, dated October 23, 2000, to sell 1.3 MWs of wind energy to Alliant Energy over a term of five years.

8.　　　The 100% membership interests in Northern Alternative Energy Wyoming, LLC, which was formed to develop two wind power production projects in the state of Wyoming. The projects developed and built by this LLC have been sold and this company is currently an inactive business.

9.　　　The 100% membership interest in Navitas Energy, LLC, which is a recently formed, Delaware limited liability company. This Company will be developing the All-Source Project and entering into the power purchase agreements with NSP.

Doc#

NAVITAS　004969

SCHEDULE 1.1(C)
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001

## ASSUMED CONTRACTS AND DEBT

1.  Office Lease Agreement, by and between Northern Alternative Energy, Inc. and Broadway Ridge, LLC, dated October 3, 2000 for 60 month term commencing on December 1, 2000.

2.  Office Lease Agreement, by and between Seller and Duddy Limited Partnership, dated August 21, 1998, expires on August 31, 2001. Base rent of $1,244 per month.

3.  All contracts relating to the construction and operation of the Midwest Center for Wind Energy located in Lincoln County, Minnesota (the "Visitor's Center"), which is an eight room inn and conference center designed to promote the wind industry on the Buffalo Ridge to the general public. The Visitor's Center is approximately 11,2000 square feet in size and is also used as a combination office and maintenance facility for the nearby wind energy projects.

4.  Note receivable from Seller stockholder and officer, approximate outstanding balance of $312,811.

5.  Note payable to United States Small Business Administration, due in monthly installments of $9,435 through September 2020 including interest at 7.3% and monthly administrative charges of $1,521, secured by mortgage and guaranteed by shareholder. Outstanding balance – $992,008.

6.  Note payable to bank, due in monthly installments of $8,543 through December 2020 including interest at 3.5% above the U.S. Treasury rate, secured by mortgage. Outstanding balance -- $900,000.

7.  Note payable to bank, due in monthly installments of $7,144 through December 2011 including interest at 3.5% above the prime rate of the bank, secured by mortgage and all assets of the Company. Outstanding balance - $529,758. This debt is owed by NAE Sibley, a Subsidiary Interest being transferred hereby, and will remain an obligation of NAE Sibley.

Doc# 129212616

8. Note payable to the bank, due in monthly installments of $4,802 through September 2012 including interest at 3.5% above the prime rate of the bank which was 8.25% at September 30, 1999 and 1998, secured by mortgage, all assets of the Company and personal guarantee of major stockholder/officer. Outstanding balance - $363,961. This debt is owed by NAE Allendorf, a Subsidiary Interest being transferred hereby, and will remain an obligation of NAE Allendorf.

9. Capital lease obligations (for computer equipment) at implicit rates of 11.9% and 25.8%, payable in monthly installments totaling $7,701 and $5,601 at September 30, 2000 and 1999, respectively to 2004. Outstanding balance - $187,242.

10. Note payable to a foundation, due in monthly installments of $1,856 through July 2005 including interest at 7.5% secured by mortgage, all assets of the Company and personal guarantee of major stockholder/officer. Outstanding balance - $197,735.

11. Note payable to bank, due in monthly installments of $1,389 through September 2012 including imputed interest at 12%, secured by mortgage, all assets of the Company and personal guarantee of major stockholder/officer. Outstanding balance - $105,080. This debt is owed by NAE Allendorf, a Subsidiary Interest being transferred hereby, and will remain an obligation of NAE Allendorf.

12. Note payable to financing corporation (Amex) dated September 7, 1999, due in monthly installments of $515.51 through September 2004 including imputed interest at 12.99%, unsecured. Outstanding balance – $18,316.

13. Notes payable to financing corporation (Amex) dated September 20, 1999, due in monthly installments of $1,179, through October 2002 including imputed interest at 12.9%, secured by equipment. Outstanding balance – $22,973.

14. Note payable to an auto financing corporation, due in monthly installments of $478 through April 2004 including imputed interest at 8%, secured by vehicle. Outstanding balance - $16,747.

15. Note payable to an auto financing corporation, due in monthly installments of $399 through February 2004 including imputed interest at 8%, secured by vehicle. Outstanding balance - $13,970.

16. Note payable to financing corporation, due in monthly installments of $349 through March 2003 including imputed interest at 12.9%, secured by equipment. Outstanding balance – $7,963.

17. State Farm Insurance, policy # 13568-E11-23, for automobile insurance;

NAVITAS 004971

(                                          (

18.   Northwestern Mutual Life, policy # 15-228-340, for a $2,300,000 life insurance policy on Gregory Jaunich as required by financing agreements for the Midwest Center for Wind Energy;

19.   Mount Hawley Insurance Company, policy # MGL 0126993, for general commercial liability coverage;

20.   Globe Indemnity Company, policy # X00056000, for coverage of seven wind turbines and the Midwest Center for Wind Energy;

21.   Guaranty National Insurance Company, policy #BA1231465, for property and liability coverage on the leased vehicles;

22.   State Farm Insurance, policy # 139631B23, for property and liability coverage on an automobile.

23.   Rental Agreement by and between NAE and IOS Capital, Inc. dated October 13, 2000, with monthly installments of $230, providing use of a copier.

24.   Alliance Agreement with Dillon New Media for website development dated 7/1/99. The agreement grants to Dillon New Media options to purchase stock in NAE at$0.85/share. As of December 31, 2000, 157,310 options remain outstanding.

25.   Furniture lease by and between NAE and GCI Capital, Inc. dated January 22, 2001.

26.   Wind Lease by and between NAE and Northern Alternative Energy Shaokatan Power Partners, LLC

Doc# 129212656

NAVITAS   004972

SCHEDULE 1.1(D)
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001

## INTELLECTUAL PROPERTY

1. Patent application serial number 09/630,375 entitled "Energy System Providing Continual Electric Power Using Wind Generated Electricity Coupled with Fuel Driven electrical Generators." Filed in the U.S. PTO on August 1, 2000.

2. Windpower.com; Greenjunction.com. Subsidiary Interest EZWatt shall continue to own the EZWatt.com domain name.

3. Trademark applications submitted by Navitas, Inc. to the U.S. Patent Trademark Office for the following marks:

   NAVITAS serial number 75/786801 filed 08/27/1999;
   NAVITAS.COM serial number 75/786802 filed 08/27/1999;
   NAVITAS.COM YOUR ENERGY CHOICE SUPERSTORE AND DESIGN Serial number 75/798703 filed 09/18/1999;
   NAVITAS YOUR ENERGY CHOICE SUPERSTORE serial number 75/798702 filed 09/15/1999.

   Trademark applications submitted by NAE to the to the U.S. Patent Trademark Office for the following marks:

   EZ WATT serial number 75889247 filed January 6, 2000
   EASY WATT serial number 75889248 filed January 8, 2000
   GREEN JUNCTION serial number 76053005 filed May 22, 2000

4. All of Seller's intangible assets or intellectual property not otherwise specified herein that relate to the assets transferred by this Agreement, including but not limited to trade names and logos of each of the Subsidiary Interests, technical data, blue prints, and licenses for each of assets transferred hereby, books and records of each Subsidiary Interests, goodwill of each of the Subsidiary Interests, permits and licenses and other proprietary rights owned or used by Seller with respect to the Subsidiary Interests or the other assets transferred hereby.

Doc# 1292126/6

**SCHEDULE 1.1(E)**
**TO**
**ASSET PURCHASE AGREEMENT**
**BY AND BETWEEN**
**NAVITAS ENERGY, INC.**
**AND**
**NORTHERN ALTERNATIVE ENERGY, INC.**
**DATED JANUARY 2, 2001**

## EMPLOYMENT AGREEMENTS

1.      Employment Agreement, by and between Northern Alternative Energy, Inc. and Brian Lammers, dated November 18, 1998.

2.      Employment Agreement, by and between Northern Alternative Energy, Inc. and Bao Vang, dated July 1, 1999.

3.      Employment Agreement, by and between Northern Alternative Energy, Inc. and Wes Slaymaker dated May 15, 2000.

4.      Employment Agreement, by and between Northern Alternative Energy, Inc. and Mark Hanson, dated August 1, 2000.

5.      Employment Agreement, by and between Northern Alternative Energy, Inc. and Mary Grantham, dated November 27, 2000.

6.      Employment Agreement, by and between Northern Alternative Energy, Inc. and Vanessa VanderVelde, dated December 15, 2000.

NAVITAS  004974

SCHEDULE 1.1(F)
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001

<u>PERMITS</u>

1. 2000 License for food, beverage or lodging establishments granted by Lincoln, Lyon, Murry and Pipestone Public Health Services.

Doc# 1292126/6

NAVITAS 004975

**SCHEDULE 1.1(G)**
**TO**
**ASSET PURCHASE AGREEMENT**
**BY AND BETWEEN**
**NAVITAS ENERGY, INC.**
**AND**
**NORTHERN ALTERNATIVE ENERGY, INC.**
**DATED JANUARY 2, 2001**

## REAL PROPERTY

1.     The Northwest quarter (NW1/4) of Section Twenty-Nine (29), Township One Hundred
Eleven (111) North, Range Forty-Six 46 West of the Fifth Principal Meridian.

Doc# 129212676

NAVITAS 004976

SCHEDULE 1.1(H)
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001

## OTHER PROPERTY

1.    2500 shares of common stock of Solar Attic, Inc.
2.    Vehicle-Mercedes Truck, purchased April 7, 1999.
3.    Vehicle-GMC Savanna purchased February 11, 2000.
4.    Note payable from EZWatt to Seller. Outstanding balance on December 31, 2000 was $230,739.
5.    Note payable from Northern Alternative Energy Sibley, LLC to Seller. Outstanding balance on December 31, 2000 was $39,937.
6.    Note payable from Northern Alternative Energy Sibley Hills, LLC to Seller. Outstanding balance on December 31, 2000 was $327,259.

Doc# 12921264\6

NAVITAS -004977

SCHEDULE 2.1(B)
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001

## ACCOUNTS PAYABLE

1. The accounts payable balance of $550,723, as of December 31, 2000, payable to various vendors;

2. Accrued vacation of $28,281, as of December 31, 2000, payable to Seller's employees;

3. Accrued payroll of $41,150, as of December 31, 2000, payable to Selling Stockholder and officer of Seller;

4. An outstanding credit card balance of $23,578, as of December 31, 2000, payable to American Express.

Doc# 129212676

NAVITAS 004978

**SCHEDULE 2.1(G)**
**TO**
**ASSET PURCHASE AGREEMENT**
**BY AND BETWEEN**
**NAVITAS ENERGY, INC.**
**AND**
**NORTHERN ALTERNATIVE ENERGY, INC.**
**DATED JANUARY 2, 2001**

<u>NOTES PAYABLE TO SUBSIDIARY INTERESTS</u>

1.  Note Payable to Northern Alternative Energy Allendorf, LLC. The note is non-interest bearing and as of December 31, 2000 has an outstanding balance of $764,499;

2.  Note Payable to Northern Alternative Energy Wyoming, LLC. The note is non-interest bearing and as of December 31, 2000 has an outstanding balance of $199,723;

3.  Note Payable to Northern Alternative Energy Shaokatan, LLC. The note is non-interest bearing and as of December 31, 2000 has an outstanding balance of $80,609;

4.  Subscription Payable to Navitas, Inc. The subscription is non-interest bearing and as of December 31, 2000 has an outstanding balance of $1,000;

5.  Subscription Payable to GreenJunction.com, Inc. The subscription is non-interest bearing and as of December 31, 2000 has an outstanding balance of $1,000;

Doc# 1292126/6

SCHEDULE 5.3
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001

## CONSENTS

*Office Leases*

1. Broadway Ridge, LLC for office Lease Agreement, by and between Northern Alternative Energy, Inc. and Broadway Ridge, LLC, dated October 3, 2000 for 60 month term commencing on December 1, 2000;

2. Duddy Limited Partnership for office Lease Agreement, by and between Seller and Duddy Limited Partnership, dated August 21, 1998, expires on August 31, 2001. Base rent of $1,244 per month.

*Capital and Operating Leases*

3. Dell Financial Services, Inc. for two computer leases by and between Seller and Dell Computer Corporation for all computer leases;

4. Conseco Finance Vendor Services Corporation for three computer leases by and between Seller and Gateway Computer Corporation for all computer leases;

5. Preferred Capital Corporation for four capital leases by and between Seller and Preferred Capital Corporation for the purchase of various computer equipment;

6. IOS Capital, Inc. for copier rental agreement.

7. GCI Capital, Inc. for an office furniture lease by and between Seller and GCI Capital, Inc.

*Insurance*

8. State Farm Insurance for insurance policy numbers 13568-E11-23 and 139631B23;

Doc# 1292126/6

NAVITAS  004980

9. Northwestern Mutual Life for policy number 15-228-340;

10. Mount Hawley Insurance Company for policy number MGL 0126993;

11. Globe Indemnity Company for policy number X00056000;

12. Guaranty National Insurance Company, policy number BA 1231465.

13. Medica, for policy number 28540.

*Employment Agreement*

14. Sandra Broekema for consent to not terminate her employment agreement with EZWatts.com, Inc. upon transfer of ownership and control of EZWatts.com, Inc. to Buyer;

15. Consent of each employee listed on Schedule 1.1(e) to transfer of his or her employment agreement to Buyer;

*Assumed Contracts and Debt*

16. National City Bank for consent to transfer of assets from Seller to Buyer;

17. Small Business Administration for consent to transfer of note payable, the Midwest Center for Wind Energy and surrounding land, which is encumbered by a mortgage held by the Small Business Administration, to Buyer;

18. Small Business Administration for consent to transfer ownership interest of Northern Alternative Energy Shaokatan, LLC, whose land is encumbered by a mortgage held by the Small Business Administration, to Buyer;

19. First National Bank & Trust of Pipestone for consent to transfer of note payable, the Midwest Center for Wind Energy and surrounding land, which is encumbered by a mortgage held by First National Bank & Trust of Pipestone, to Buyer;

20. Southwest Minnesota Foundation for consent to transfer of note payable, the Midwest Center for Wind Energy and surrounding land, which is encumbered by a mortgage held by the Southwest Minnesota Foundation, to Buyer;

21. American Express Finance Company for consent to transfer three notes payable with total outstanding balance of $72,830 to Buyer;

22. Mercedes Benz Corporation for consent to transfer vehicle and lease to Buyer;

23. GMAC Financial Services for consent to transfer vehicle and lease to Buyer;

Doc# 129212696

NAVITAS  004981

24. Harry K. Chevolet for consent to transfer two vehicles and leases to Buyer;

25. Contracts relating to construction and operation of Midwest Center for Wind Energy;

26. Peoples Bank for consent to change in control of Seller;

27. First Minnesota Bank for sale of interest in Northern Alternative Energy Sibley, LLC;

28. Northern Alternative Energy Shaokatan Power Partners, LLC consent to assignment of Wind Lease.

Licenses

1.    2000 License for food, beverage and lodging granted by Lincoln, Lyon, Murry and Pipestone Public Health Services

Intellectual Property

1. Patent application serial number 09/630,375 entitled " Energy System Providing Continual Electric Power Using Wind Generated Electricity Coupled with Fuel Driven electrical Generators." Filed in the U.S. PTO on August 1, 2000.

2. Transfer of domain names  Windpower.com and Greenjunction.com.  Subsidiary Interest EZWatt shall continue to own the EZWatt.com domain name.

3. US Patent & Trademark office for trademark application for EZ Watt Serial No. 75889247

4. US Patent & Trademark office for trademark application for Easy Watt Serial No. 75889248.

5. US Patent & Trademark office for trademark application for Green Junction Serial No. 76053005

6. US Patent & Trademark office for trademark application for Navitas Serial No. 75786801

7. US Patent & Trademark office for trademark application for Navitas.com Serial No. 75786802

8. US Patent & Trademark office for trademark application for Navitas.com Your Energy Choice Superstore and Design Serial No. 75798703

9. US Patent & Trademark office for trademark application for Navitas Your Energy Choice Superstore Serial No. 75798702

Doc# 1292126/6

NAVITAS   004982

**SCHEDULE 5.8
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001**

**ADVERSE CHANGES**

None.

Doc# 1292126/6

NAVITAS 004983

SCHEDULE 5.10
**TO**
**ASSET PURCHASE AGREEMENT**
**BY AND BETWEEN**
**NAVITAS ENERGY, INC.**
**AND**
**NORTHERN ALTERNATIVE ENERGY, INC.**
**DATED JANUARY 2, 2001**

## CREDIT FACILITY

Seller is not in compliance with all of the covenants in the Credit Facility.

Doc# 129212646

NAVITAS 004984

SCHEDULE 5.9
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001

## SUBSIDIARY INTEREST ENCUMBRANCES

1.   NAE Allendorf:

  a.   Heritage State Bank Note dated April 1997, monthly installments $4,802, due September 2012 (Financing statement 1935087 Minnesota Secretary of State). Balance on 12/31/00 $365,646

  b.   Iowa State University Note dated April 1997, monthly installments of $1,389, due September 2012. Balance on 12/31/00 was $105,080

2.   NAE Sibley:

  a.   First Minnesota Bank Note dated December 16, 1996, monthly installments of $7,144 due December 2011(financing statement 1902396 Minnesota Secretary of State). Balance on 12/31/00 was $533,201.

3.   NAE Shaokatan

  a.   Ground Leases dated September 9, 1998 with Shaokatan Hills, LLC and Lakota Ridge, LLC.

  b.   Mortgage dated September 1, 2000 in favor of U.S. Small Business Administration.

  c.   Pledge Agreements dated September 9, 1998 regarding Shaokatan Hills, LLC and Lakota Ridge LLC membership interest in favor of Heller Financial, Inc. and Mission Funding Zeta (Financing statement 2071183 filed September 25, 1998 with Minnesota Secretary of State)

4.   Sibley Hills, LLC

  a.   Financing statement no. 2282162 dated December 12, 2000 in favor of secured party, National City Bank of Minneapolis filed in Secretary of State--Minnesota.

  b.   Financing Statement no. P150927 dated December 18, 2000 in favor of secured party, National City Bank of Minneapolis filed in Osceola County, Iowa.

  c.   Financing statement 20001532 in favor of Vestas-American Wind Technology, Inc. filed on November 20, 2000 with Osceola County, Iowa.

Doc# 1292126/6

NAVITAS   004985

## SCHEDULE 5.13
### TO
### ASSET PURCHASE AGREEMENT
### BY AND BETWEEN
### NAVITAS ENERGY, INC.
### AND
### NORTHERN ALTERNATIVE ENERGY, INC.
### DATED JANUARY 2, 2001

## TITLE

1.    See Schedule 5.22 for Real Property Permitted Encumbrances.

2.    See Schedule 5.9 Subsidiary Interest Encumbrances.

Doc# 1292126/6

NAVITAS ·004986

SCHEDULE 5.14
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001

## CONTRACT DEFAULTS

Seller is not in compliance with all of the covenants in the note payable to the U.S. Small Business Administration.

Doc# 1292126/6

NAVITAS -004987

SCHEDULE 5.21
TO
ASSET PURCHASE AGREEMENT
BY AND BETWEEN
NAVITAS ENERGY, INC.
AND
NORTHERN ALTERNATIVE ENERGY, INC.
DATED JANUARY 2, 2001

## SELLER STOCK OPTION AGREEMENTS

1. Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Michelle Rogers, dated January 5, 1996, for 176,471 option shares exercisable at $0.85 per share, which option expires on January 5, 2006.

2. Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Gregory J. Jaunich, dated March 24, 1999, for 300,000 option shares exercisable at $0.85 per share, which option expires on March 23, 2009.

3. Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Julie T. Jaunich, dated March 24, 1999, for 7,843 option shares exercisable at $0.85 per share, which option expires on March 23, 2009.

4. Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and John P. Fennig, dated March 24, 1999, for 7,843 option shares exercisable at $0.85 per share, which option expires on March 23, 2009.

5. Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Scott D. Nelson, dated March 24, 1999, for 7,843 option shares exercisable at $0.85 per share, which option expires on March 23, 2009.

6. Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Dillon New Media Corporation (now iPares, Ltd.), dated July 1, 1999, originally for 262,822 option shares exercisable at $0.85 per share, of which 136,387 option shares have been exercised thus 126,435 option shares remain exercisable, which option expires on June 30, 2009.

7. Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Brian Lammers, dated August 1, 1999, for 15,000 option shares exercisable at $0.85 per share, which option expires on July 31, 2009.

8. Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Gregory J. Jaunich, dated January 10, 2000, for 150,000 option shares exercisable at $1.25 per share, which option expires on January 9, 2010.

9. Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Julie T. Jaunich, dated January 10, 2000, for 20,000 option shares exercisable at $1.25 per share, which option expires on January 9, 2010.

10. Non-qualified Stock Option Agreement, by and between Northern Alternative

Doc# 1292126/6

Energy, Inc. and John P. Fennig, dated January 10, 2000, for 20,000 option shares exercisable at $1.25 per share, which option expires on January 9, 2010.

11.    Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Scott D. Nelson, dated January 10, 2000, for 20,000 option shares exercisable at $1.25 per share, which option expires on January 9, 2010.

12.    Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Brian Lammers, dated January 10, 2000, for 5,000 option shares exercisable at $1.25 per share, which option expires on January 9, 2010.

13.    Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Bao Vang, dated January 10, 2000, for 5,000 option shares exercisable at $1.25 per share, which option expires on January 9, 2010.

14.    Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Wes Slaymaker, dated December 1, 2000, for 5,000 option shares exercisable at $4.00 per share, which option expires on November 30, 2010.

15.    Non-qualified Stock Option Agreement, by and between Northern Alternative Energy, Inc. and Sandra Broekema, dated December 1, 2000, for 20,000 option shares exercisable at $4.00 per share, which option expires on November 30, 2010.

Doc# 1292126/6

NAVITAS  004989

**SCHEDULE 5.22**
**TO**
**ASSET PURCHASE AGREEMENT**
**BY AND BETWEEN**
**NAVITAS ENERGY, INC.**
**AND**
**NORTHERN ALTERNATIVE ENERGY, INC.**
**DATED JANUARY 2, 2001**

## PERMITTED ENCUMBRANCES FOR REAL PROPERTY

See attached list.

Doc# 1292126/6

NAVITAS 004990

## EXHIBIT A

**(form of Promissory Note)**

Doc# 1292126/6

NAVITAS 004991

# EXHIBIT B

### (form of Security Agreement)

Doc# 1292126/6

NAVITAS    004992

**EXHIBIT C**

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT ("Bill of Sale") is made and entered into as of March 9, 2001, by Northern Alternative Energy, Inc., a Minnesota corporation ("Seller"), and Navitas Energy, Inc., a Minnesota corporation ("Buyer").

### RECITALS

A.    Buyer and Seller have entered into that certain Asset Purchase Agreement, dated as of January 2, 2001 (the "Asset Purchase Agreement"), providing, upon the terms and conditions set forth therein, for the sale, transfer and assignment by Seller of certain assets specified therein and the assumption by Buyer of certain liabilities of Seller specified therein, with such transfers of assets and liabilities to occur at multiple Closing Dates, with this March 9, 2001 constituting the Initial Closing between the parties.

B.    As required pursuant to Sections 9.1(E) and 9.2(C) of the Asset Purchase Agreement, Seller and Buyer are executing and delivering this Bill of Sale.

C.    Capitalized terms used herein without definition shall have the meanings ascribed to them in the Asset Purchase Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, and upon the terms and conditions set forth in the Asset Purchase Agreement, the parties hereby agree as follows:

1.    <u>Assignment.</u>  Seller hereby sells, conveys, transfers, assigns and delivers to Buyer all of Seller's right, title and interest in the following Assets (collectively, the "Assets"):

(a)    All of the Negotiating Positions as listed on Schedule 1.1(A);

(b)    The following Subsidiary Interests as listed on Schedule 1.1(B): EZWatt.com, Inc., Navitas, Inc., Green Junction.com, Incorporated, Sibley Hills, LLC, Northern Alternative Energy Wyoming, LLC; and Navitas Energy, LLC;

(c)    Note Receivable from NAE stockholder, Gregory Jaunich, dated December 31, 2000, in the amount of $312,811;

(d)    Alliance Agreement with Dillon New Media dated July 1, 1999;

(e)    All of the Intellectual Property as listed on Schedule 1.1(D);

(f)    The note payable from EZWatt ($230,739); and

(g)    2500 shares of common stock of Solar Attic, Inc.

2.    <u>No Encumbrances.</u>  Seller warrants to Buyer that, except as otherwise provided in

Doc# 1368193

NAVITAS 007605

the Asset Purchase Agreement, title to all the Assets transferred hereby is conveyed to Buyer free and clear of all liens, claims and encumbrances whatsoever, and Seller has good right to sell and assign the Assets.

3.     Further Assurances.  Seller hereby constitutes and appoints Buyer and its successors and assigns as the attorney-in-fact of the Seller with full power of substitution, to institute and prosecute, in the name of Seller or Buyer, but on behalf of and for the benefit of Buyer, and at the expense of Buyer, all proceedings which the Buyer may deem desirable to collect, assert or enforce any claim, right or title of any kind in or to the Assets and to defend and compromise any and all actions, suits or proceedings which the owner of the Assets is entitled to defend or compromise.  Seller agrees that the foregoing powers are coupled with an interest and are and shall be irrevocable by Seller in any manner or for any reason.  Seller agrees that, at any time and from time to time after the delivery hereof, it will, upon the reasonable request of Buyer, take all action and execute and deliver all documents, instruments and conveyances of any kind which may be desirable to carry out the provisions of this Bill of Sale.

4.     Assumption.  Buyer does hereby assume, agree to perform, pay and discharge all of the following liabilities of the Seller as of this Closing Date (such liabilities being defined as the "Assumed Liabilities"):

> (a)     All of the Accounts Payable as listed on Schedule 2.1(B);
> (b)     The liabilities and obligations as set forth in the Alliance Agreement with Dillon New Media dated July 1, 1999;
> (c)     The liabilities and obligations as set forth in the Office Lease Agreement with Duddy Limited Partnership dated August 21, 1998;
> (d)     The liabilities and obligations under the Intellectual Property as listed on Schedule 1.1(D); and
> (e)     The following Notes Payable to Subsidiary Interests as listed on Schedule 2.1(G):  Note Payable to Northern Alternative Energy Wyoming, LLC, Subscription Payable to Navitas, Inc., and Subscription Payable to Greenjunction.com, Inc.

5.     Binding Effect.  This Bill of Sale shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

6.     No waiver or modification.  The execution and delivery of this Bill of Sale by Seller shall not be (or be deemed to be) a waiver or discharge of any representation, warranty, covenant or agreement of the Buyer or the Seller in or under the Asset Purchase Agreement, which representations, warranties, covenants and agreements are incorporated herein by reference.  This Bill of Sale is subject in all respects to the Asset Purchase Agreement.  In the event of a conflict between this Bill of Sale and the Asset Purchase Agreement, the Asset Purchase Agreement shall govern.

7.     Governing Law.  This Bill of Sale shall be governed in all respects, including as

Doc# 1368193

NAVITAS  007606

to validity, interpretation and effect, by the internal laws of the State of Minnesota.

IN WITNESS WHEREOF, Seller and Buyer have executed this instrument this 9th day of March, 2001.

NORTHERN ALTERNATIVE
ENERGY, INC.

By: _____

Its: _____PRESIDENT_____

**"SELLER"**

NAVITAS ENERGY, INC.

By: _____

Its: _____PRESIDENT_____

**"BUYER"**

Doc# 1368193

NAVITAS 007607

# EXHIBIT D

# TRUE-UP AGREEMENT

THIS TRUE-UP AGREEMENT (the "Agreement") is made effective as of May 23, 2002, by and between Navitas Energy, Inc., a Minnesota corporation (the "Buyer"), and Northern Alternative Energy, Inc., a Minnesota corporation (the "Seller").

## RECITALS

A.     Buyer and Seller are parties to an Asset Purchase Agreement dated January 2, 2001, as amended by the First Amendment to Asset Purchase Agreement (as amended, the "Asset Purchase Agreement"), pursuant to which Buyer agreed to acquire certain assets of Seller and assumed certain liabilities of Seller.

B.     Buyer acquired certain assets and assumed certain liabilities of Seller pursuant to that certain Bill of Sale, Assignment and Assumption Agreement dated March 9, 2001 (the "Initial Closing Bill of Sale").

C.     Buyer and Seller have agreed to finalize the transfer of assets and assumption of liabilities and to finalize the purchase price that the Company owes NAE, all pursuant to the Asset Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.     Incorporation.  The Asset Purchase Agreement and the recitals listed above are hereby incorporated into this Agreement.  Terms used herein and not otherwise defined shall have the meaning ascribed to them in the Asset Purchase Agreement.

2.     Transfer of Assets and Assumption of Liabilities.     The parties agree that performance pursuant to this Agreement, together with any earlier performance pursuant to the Asset Purchase Agreement, shall collectively constitute the transfer of Seller's assets to Buyer and the assumption of Seller's liabilities by Buyer and the Purchase Price adjustment, all of which was contemplated in the Asset Purchase Agreement.

3.     Specific Assets Transferred.     As was contemplated in the Asset Purchase Agreement, Seller agrees to sell, assign, transfer, convey and deliver to Buyer on the Closing Date (as defined below) and Buyer agrees to purchase from Seller, the following assets (the "Assets"):

(a)     Certain Subsidiaries.  Ownership interests of Seller in those certain subsidiary companies as of the 2002 Closing Date, as listed on Schedule 3(a) hereof (the "Subsidiary Interests");

1

CONFIDENTIAL     NAE00008

(b) <u>Real Property</u>. All rights and interest of Seller in the real property as of the 2002 Closing Date, as listed on Schedule 3(b) hereof (the "Real Property");

(c) <u>Contract Rights</u>. All rights of Seller under the contracts, agreements, promissory notes, commitments and other arrangements as of the 2001 Closing Date (the "Assumed Contracts"), as listed on Schedule 3(c) hereof;

(d) <u>Other Assets</u>. All rights and interest of Seller in the other personal property as of the 2002 Closing Date, as listed on Schedule 3(d) hereof (the "Other Assets");

4.    <u>Assumed Liabilities</u>. As part of the consideration for the purchase and sale of the Assets, Buyer will assume, pay and satisfy as they become due, the following (the "Assumed Liabilities") as of the 2001 Closing Date:

(a) The liabilities and obligations of Seller under the Assumed Contracts, but not including any liability or obligation for any breach thereof occurring on or prior to the 2001 Closing Date;

(b) The liabilities of Seller under those certain promissory notes made in favor of the Subsidiary Interests, as such liabilities listed on Schedule 4(b) hereof.

5.    <u>Adjustment to Purchase Price</u>. Notwithstanding anything in the Asset Purchase Agreement to the contrary, the parties agree that the adjusted Purchase Price to be paid at the 2002 Closing for the Assets transferred by Seller to Buyer pursuant to the Initial Closing Bill of Sale and transferred pursuant to this True-up Agreement will be $1,420,000 (the "Adjusted Purchase Price"). Seller agrees to return to Buyer the promissory notes made by Buyer and payable to Seller dated March 9, 2001, in the principal amount of $4,153,433 and $400,000 in replacement of the Adjusted Purchase Price. The parties acknowledge that the Adjusted Purchase Price has been paid by Buyer to Seller as follows:

(a) A cash payment of $300,000 that was made by Buyer to Seller in July, 2002; and

(b) Buyer issued and delivered stock certificate number 116 to Seller for 280,000 shares of the Buyer's $.01 par value Common Stock (the "Shares") which was issued on May 23, 2002.

6.    <u>Closing</u>. For purpose of this Agreement the following definitions shall apply:

(a) "2001 Closing" means the transfer of Assets to Buyer and the assumption of Seller's liabilities by Buyer pursuant to the terms of the Asset Purchase Agreement and the Initial Closing Bill of Sale which occurred as of the 2001 Closing Date.

(b) "2001 Closing Date" means March 9, 2001.

2            CONFIDENTIAL        NAE00009

(c)     "2002 Closing" means the transfer of Seller's Assets to Buyer and the assumption of Seller's liabilities by Buyer pursuant to the terms of the Asset Purchase Agreement and this Agreement which shall occur on 2002 Closing Date.

(d)     "2002 Closing Date" means October 7, 2002.

(e)     "Closings" shall collectively mean the 2001 Closing and 2002 Closing.

(f)     "Closing Dates" shall collectively mean the 2001 Closing Date and the 2002 Closing Date.

The Closings shall be held at such place as the parties mutually agree.

7.      Representations and Warranties of Seller. As of the 2002 Closing Date, Seller represents and warrants to Buyer as follows:

(a)     Corporate Existence. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Minnesota and has the requisite corporate power to own its properties and to carry on its business as now being conducted.

(b)     Authorization. Except for the third party consents which are in the process of being obtained by Seller and which are noted on Schedule 7(g), Seller has all necessary power and authority to enter into and perform this Agreement. The execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated by this Agreement have been duly authorized by all requisite corporate action of Seller. This Agreement has been executed and delivered by a duly authorized officer of Seller and is a valid and binding agreement of Seller, enforceable against Seller in accordance with its terms, except as the enforceability of any such agreement may be limited by applicable bankruptcy, insolvency, reorganization or moratorium or other similar laws relating to the rights of creditors generally, and by general principles of equity.

(c)     No Violation. Except for the third party consents which are in the process of being obtained by Seller and which are noted on Schedule 7(g), neither the execution and delivery of this Agreement, nor the consummation by the Seller of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, of any contract or other agreement or of any statute or administrative regulation, or of any order, writ, injunction, judgement or decree of any court or any governmental authority or of any arbitration award applicable to the Seller.

(d)     Subsidiary Interests. Except as set forth on Schedule 7(d), all Subsidiary Interests transferred by Seller are owned by Seller free and clear of any encumbrances.

NAE00010

(e)    Assumed Contracts. Each of the Assumed Contracts is in full force and is binding upon and enforceable against the parties to each contract, except as such enforceability may be limited by the effect of bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditor rights generally or by general principles of equity. Except for the third party consents which are in the process of being obtained by Seller and which are noted on Schedule 7(g), and except as set forth on Schedule 7(e), no default, or event which with notice or lapse of time or both would constitute a default by Seller or by the other contracting parties, has occurred under any of the Assumed Contracts or will occur as a result of Seller's execution and delivery of this Agreement or consummation of the transactions contemplated by this Agreement.

(f)    Title to Real Property. Seller owns the Real Property free and clear of all encumbrances except for the encumbrances described on Schedule 7(f) (the "Permitted Encumbrances"). Seller is not in default of any term or condition of the Permitted Encumbrances. Seller has received no notice of actual or threatened special assessments or reassessments of the Real Property. To the best of Seller's belief and knowledge there are no conditions on the Real Property which violate any state or federal environmental laws or any conditions which require remediation under any environmental laws. Seller also represents and warrants to Buyer that to Seller's knowledge there are no unrecorded contracts, leases, easements, or other agreements on interests relating to the Real Property.

(g)    Consents and Approvals. Except as set forth on Schedule 7(g), no consent, authorization, order or approval of or filing or registration with any governmental authority, and no material consent or authorization from any other entity or person, is required for the execution and delivery of this Agreement and the consummation by the Seller of the transactions contemplated by this Agreement.

8.    Representations and Warranties of Buyer. As of the 2002 Closing Date, Buyer represents and warrants to Seller as follows:

(a)    Corporate Existence. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Minnesota and has the requisite corporate power to own its properties and to carry on its business as now being conducted.

(b)    Authorization. Except for the third party consents which are in the process of being obtained by Seller and which are noted on Schedule 7(g), Buyer has all necessary power and authority to enter into and perform this Agreement. The execution and delivery of this Agreement by Buyer and the consummation of the transactions contemplated by this Agreement have been duly authorized by all requisite corporate action of Buyer. This Agreement has been executed and delivered by a duly authorized officer of Buyer and is a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, except as the enforceability of any such agreement may be limited by applicable bankruptcy, insolvency, reorganization or moratorium or

other similar laws relating to the rights of creditors generally, and by general principles of equity.

(c) <u>No Violation</u>. Except for the third party consents which are in the process of being obtained by Seller and which are noted on Schedule 7(g), neither the execution and delivery of this Agreement, nor the consummation by the Buyer of the transactions contemplated in this Agreement, will conflict with or result in a breach of any of the terms, of any contract or other agreement or of any statute or administrative regulation, or of any order, writ, injunction, judgement or decree of any court or any governmental authority or of any arbitration award applicable to the Buyer.

(d) <u>Purchase of Stock and Membership Interests</u>. The membership interests and stock comprising part of the Assets shall be acquired by the Buyer for its own account for the purpose of investment, it being understood that the right to dispose of such securities shall be entirely within the discretion of the Buyer. Buyer shall refrain from transferring or disposing of any such securities or any interest therein in such manner as to cause Seller to be in violation of the registration requirements of the Securities Act of 1933, as amended or applicable state securities or blue sky laws.

9. <u>Buyer's Deliveries</u>. At the 2002 Closing, Buyer shall execute and/or deliver to Seller the following:

(a) a copy of the resolutions of Buyer's Board of Directors (certified by an officer of Buyer), authorizing the execution, delivery and performance of this Agreement as having been duly adopted and as being in full force and effect on the 2002 Closing Date;

(b) a Bill of Sale and Assignment Agreement in the form of Exhibit 1 with respect to certain of the Assets to be transferred to Buyer at the 2002 Closing (the "Bill of Sale");

10. <u>Seller's Deliveries</u>. At the 2002 Closing, Seller shall deliver to Buyer physical possession of all Assets which are herein described to be delivered to Buyer at the 2002 Closing, and shall execute (where applicable in recordable form) and/or deliver to Buyer all of the following:

(a) a copy of the resolutions of Seller's Board of Directors (certified by an officer of Seller), authorizing the execution, delivery and performance of this Agreement as having been duly adopted and as being in full force and effect on the 2002 Closing Date; and

(b) the Bill of Sale;

(c) all consents obtained by Seller for the assignment to Buyer of the Assumed Contracts;

CONFIDENTIAL    NAE00012

(c)     a letter of undertaking to obtain all other consents for the assignment to Buyer of the Assumed Contracts ("Letter of Undertaking");

(d)     A warranty deed and related conveyancing instruments necessary to transfer the Real Property to Buyer including without limitation:

      i.  FIRTPA;
      ii.  Affidavit Regarding Seller;
      iii.  Assignment of Lease(s);
      iv.  Certificate of Real Estate Value and Supplemental Schedule.

11.     Survival and Indemnification.

11.1     Survival.     The representations, warranties, covenants and indemnification provisions contained in this Agreement, and in any certificate delivered pursuant to this Agreement at the Closings, will survive the Closings.

11.2     Buyer's Indemnification Covenants.  In addition to the Buyer's indemnification obligations to Seller under the Asset Purchase Agreement, Buyer shall indemnify Seller from and against all liability, demands, claims, actions or causes of action, assessments, losses, fines, penalties, costs, damages and expenses, including reasonable attorneys' fees and disbursements incurred in connection therewith and in seeking indemnification therefor, sustained or incurred by Seller as a result of or arising out of or by virtue of:

(a)     any inaccuracy in a representation or warranty made by Buyer to Seller in this Agreement;

(b)     the failure of Buyer to comply with, or the breach by Buyer of any of the covenants in this Agreement;

(c)     the failure of Buyer to perform on any of the Assumed Liabilities after the 2001 Closing Date;

11.3     Seller's Indemnification Covenants.  In addition to the Seller's indemnification obligations to Buyer under the Asset Purchase Agreement, Seller shall indemnify Buyer, its affiliates, successors and assigns from and against all liability, demands, claims, actions or causes of action, assessments, losses, fines, penalties, costs (including investigation and remediation costs), damages and expenses, including reasonable attorneys' fees and disbursements incurred in connection therewith and in seeking indemnification therefor, sustained or incurred by the Buyer, its affiliates, successors or assigns as a result of or arising out of or by virtue of:

(a)     any inaccuracy in a representation or warranty made by Seller to Buyer in this Agreement;

CONFIDENTIAL     NAE00013

(b)     the failure of Seller to comply with, or the breach by Seller of any of the covenants in this Agreement;

(c)     the mechanics liens noted as numbers 7, 8, 9, 10 and 11 on Schedule 7(f) hereof;

(d)     the failure of Seller to obtain all the consents for the benefit of Buyer, as specified on Schedule 7(g) hereof or as otherwise provided in the Letter of Undertaking, on or before December 31, 2002.

11.4     Indemnification Process.  The parties agree that any claim for indemnification under this Agreement will be subject to the indemnification procedures set forth in the Asset Purchase Agreement.

12.     Miscellaneous.

12.1     Termination.  Notwithstanding any provision in this Agreement to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, at any time on or prior to the 2002 Closing:

(i) by mutual written consent of Buyer and Seller;

(ii) by Buyer if any of the deliveries set forth in Section 10 have not been completed, or waived in writing by Buyer;

(iii) by Seller if any of the deliveries set forth in Section 9 have not been completed, or waived in writing by Seller; or

(iv) by either Buyer or Seller if the 2002 Closing does not occur on or prior to December 31, 2002, but only if, prior to that date, the party requesting termination used all reasonable efforts and acted in good faith to close the transactions contemplated by this Agreement and to satisfy all conditions precedent to the closing of these transactions.  If Buyer or Seller desires to terminate this Agreement pursuant to this Section, that party must give written notice to the other party.  Upon receipt of that notice, this Agreement will be terminated without further action by any party. Nothing contained in this Section 12.1 will release any party from any liability for any breach by such party of any of the terms or provisions of this Agreement or impair the right of any party to compel specific performance by another party of its obligations under this Agreement.

CONFIDENTIAL

NAE00014

12.2    Expenses and Transfer Taxes.  All fees and expenses incurred by Seller in connection with this Agreement shall be borne by Seller and those fees and expenses are deemed to be part of the Excluded Liabilities.  All fees and expenses incurred by Buyer in connection with this Agreement shall be borne by Buyer. Seller shall pay all sales, transfer taxes (including the state deed tax due on the warranty deed), and other transfer fees which may be payable by Seller in order to effectuate the transfer of the Assets contemplated by this Agreement, but shall not be obligated to pay any taxes incurred by Buyer as a result of the transactions.  Buyer shall not be obligated for any taxes incurred by Seller as a result of the transactions.  All income received under the lease(s) of the Real Property shall be prorated between Seller and Buyer to the date of the 2001 Closing.  Seller shall transfer any security deposits held pursuant to the leases(s) to Buyer.

12.3    Notices.  All notices required or permitted to be given under this Agreement must be in writing and will be deemed given when delivered in person, or three business days after being deposited in the United States mail, postage prepaid, registered or certified mail, addressed as set forth below or on the next business day after being deposited with a nationally recognized overnight courier service addressed as set forth below or upon dispatch if sent by facsimile with telephonic confirmation of receipt from the intended recipient to the telefax number set forth below:

If to Seller addressed to:

Northern Alternative Energy, Inc.
3001 Broadway Street, Suite 695
Minneapolis, MN 55413
Fax No.: 612-370-9005

With a copy to:

David B. Dean
Rider, Bennett, Egan & Arudnel, L.L.P.
333 South Seventh Street, Suite 2000
Minneapolis, MN
Fax No.:

If to Buyer addressed to:

Navitas Energy, Inc.
3001 Broadway Street, Suite 695
Minneapolis, MN 55413
Fax No.: 612-370-9005

CONFIDENTIAL

NAE00015

With a copy to:

Girard P. Miller
Lindquist & Vennum P.L.L.P.
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Fax No.: 612-371-3207

and/or to such other respective addresses as may be designated by notice given in accordance with the provisions of this Section 12.3 except that any notice of change of address will not be deemed given until actually received by the party to whom directed.

12.4    Third Parties.  Nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any other person other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor does any provision give any third party any right of subrogation or actions over or against any party to this Agreement. This Agreement is not intended to and does not create any third party beneficiary rights whatsoever.

12.5    Schedules and Exhibits.  The Schedules and Exhibits attached to this Agreement are incorporated into this Agreement by reference and are part of this Agreement.

12.6    Entire Agreement.  This Agreement and the Schedules and Exhibits attached to this Agreement constitute the entire agreement between the parties and is binding upon and inures to the benefit of the parties and their respective legal representatives, successors and assigns.

12.7    Assignment.  This Agreement is not assignable by any party.

12.8    Non-Waiver.  The failure in any one or more instances of a party to insist upon performance of any of the terms, covenants or conditions of this Agreement, to exercise any right or privilege conferred by this Agreement, or the waiver by any party of any breach of any of the terms, covenants or conditions of this Agreement, shall not be construed as a subsequent waiver of any such terms, covenants, conditions, rights or privileges, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred. No waiver shall be effective unless it is in writing and signed by an authorized representative of the waiving party.

12.9    Modification.  This Agreement may only be amended or modified in writing signed by all of the parties.

12.10    Counterparts.  This Agreement may be executed in multiple counterparts, each of which is deemed to be an original, and all such counterparts constitute but one instrument.

CONFIDENTIAL    NAE00016

12.11   Severability.   The invalidity of any provision of this Agreement or portion of a provision shall not affect the validity of any other provision of this Agreement or the remaining portion of the applicable provision.

12.12   Headings.   The descriptive headings in this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

12.13   Draftsman.   Buyer and Seller acknowledge that this Agreement has been drafted with material input by Buyer's and Seller's respective legal counsel and Buyer and Seller agree that this Agreement shall not be interpreted against any party deemed to be the drafting party of this Agreement.

12.14   Applicable Law; Venue.   All questions concerning the validity, operation, enforceability, interpretation, construction, and effect of this Agreement shall be governed by, and determined in accordance with, the internal laws of the state of Minnesota without regard to the conflicts of law provisions of any jurisdiction.   Any litigation between the parties hereto arising under this Agreement shall be venued in a United States Federal court or a Minnesota State court, in either case, located in Minneapolis, Minnesota, and the Seller and Buyer hereby consent to the personal jurisdiction of any such court.

12.15   Non-Exclusivity.   The rights, remedies, powers and privileges provided in this Agreement are cumulative and not exclusive and are in addition to any and all rights, remedies, powers and privileges granted by law, rule, regulation or instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

NAVITAS ENERGY, INC.

By: _____

Its:   President

"BUYER"

NORTHERN ALTERNATIVE ENERGY, INC.

By: _____

Its:   President

"SELLER"

CONFIDENTIAL

NAE00017

## EXHIBIT 1

## BILL OF SALE AND ASSIGNMENT AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AGREEMENT ("Bill of Sale") is made and entered into as of October 7, 2002, by Northern Alternative Energy, Inc., a Minnesota corporation ("Seller"), and Navitas Energy, Inc., a Minnesota corporation ("Buyer").

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereby agree as follows:

1.     Assignment. Seller hereby sells, conveys, transfers, assigns and delivers to Buyer all of Seller's right, title and interest in and to:

> (i)     all that certain personal property, equipment, furniture and fixtures (collectively the "Assets") owned by the Seller and located on that Real Property described as: The Norwest Quarter (NW ¼) of Section Twenty-Nine (29), Township One Hundred Eleven (111), Range Forty-Six (46), of the Fifth Principal Meridian, Lincoln County, Minnesota;

2.     No Encumbrances. Seller warrants to Buyer that, except as otherwise provided in that certain True-Up Agreement between Buyer and Seller dated as of May 23, 2002 ("Agreement"), title to all the Assets transferred hereby is conveyed to Buyer free and clear of all liens, claims and encumbrances whatsoever, and Seller has good right to sell and assign the Assets.

3.     Further Assurances. Seller hereby constitutes and appoints Buyer and its successors and assigns as the attorney-in-fact of the Seller with full power of substitution, to institute and prosecute, in the name of Seller or Buyer, but on behalf of and for the benefit of Buyer, and at the expense of Buyer, all proceedings which the Buyer may deem desirable to collect, assert or enforce any claim, right or title of any kind in or to the Assets and to defend and compromise any and all actions, suits or proceedings which the owner of the Assets is entitled to defend or compromise. Seller agrees that the foregoing powers are coupled with an interest and are and shall be irrevocable by Seller in any manner or for any reason. Seller agrees that, at any time and from time to time after the delivery hereof, it will, upon the reasonable request of Buyer, take all action and execute and deliver all documents, instruments and conveyances of any kind which may be desirable to carry out the provisions of this Bill of Sale.

4.     Binding Effect. This Bill of Sale shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

5.     No waiver or modification. The execution and delivery of this Bill of Sale by Seller shall not be (or be deemed to be) a waiver or discharge of any representation, warranty, covenant or agreement of the Buyer or the Seller in or under the Agreement, which

CONFIDENTIAL      NAE00018

representations, warranties, covenants and agreements are incorporated herein by reference. This Bill of Sale is subject in all respects to the Agreement. In the event of a conflict between this Bill of Sale and the Agreement, the Agreement shall govern.

6.    Governing Law.  This Bill of Sale shall be governed in all respects, including as to validity, interpretation and effect, by the internal laws of the State of Minnesota.

IN WITNESS WHEREOF, Seller and Buyer have executed this instrument this _77_ day of October, 2002.

NORTHERN ALTERNATIVE
ENERGY, INC.

By: _____

Its: _____

**"SELLER"**

NAVITAS ENERGY, INC

By: _____

Its: _____ PRESIDENT _____

**"BUYER"**

CONFIDENTIAL        NAE00019

### Schedule 3(a)

### Subsidiary Interests

1.     The 99.99% membership interest in Northern Alternative Energy Sibley, LLC ("NAE Sibley") which is a company that currently manages, but does not own a Micon 600 kilowatt wind turbine on land in Sibley, Iowa.  NAE Sibley will continue to be responsible for the note with First Minnesota Bank, N.A., dated December 16, 1996, with installments of $7,144, due December 2011.  The balance on August 31, 2002 was approximately $472,642.

2.     The 99.99% membership interest in Northern Alternative Energy Allendorf, LLC ("NAE Allendorf") which is a company that currently manages and owns a 600 kilowatt wind turbine in Iowa.  NAE Allendorf  will continue to be responsible for the note with Heritage State Bank, dated April 15, 1997.  A portion of the funds for the loan was provided by the Iowa Energy Center.  This portion of the loan is not interest bearing and requires installments of $1,389, due September 2012.  The balance on the interest free portion of the loan as of August 31, 2002 was approximately $168,055.  The remaining funds advanced under the note bears an interest rate of 3.5% over prime.  This portion of the loan requires installments of $4,802, due September 2012.  The balance due on this part of the loan as of August 31, 2002 was approximately $330,769.

CONFIDENTIAL          NAE00020

### Schedule 3(b)

### Real Property

1.　　The Northwest Quarter (NW1/4) of Section Twenty-Nine (29), Township One Hundred Eleven (111), Range Forty-Six (46) of the Fifth Principal Meridian, Lincoln County, Minnesota.

CONFIDENTIAL　　　NAE00021

## SCHEDULE 3(c)

### Assumed Contracts

1. Office Lease Agreement, by and between Northern Alternative Energy, Inc. and Broadway Ridge, LLC, dated October 3, 2000 for 60-month term commencing on December 1, 2000.

2. All contracts relating to the construction and operation of the Midwest Center for Wind Energy located in Lincoln County, Minnesota, which is an eight room inn and conference center located on the real property described on Schedule 3(b) hereof.

3. Note payable to the United States Small Business Administration, due in monthly installments of $9,435 through September 2020 including interest at 7.3% and monthly administrative charges of $1,521, secured by mortgage and guaranteed by Gregory Jaunich. Outstanding balance as of August 31, 2002, was approximately $950,019.

4. Note payable to First National Bank of Pipestone, due in monthly installments of $8,543 through December 2020 including interest at 3.5% above the U.S. Treasury rate, secured by mortgage. Outstanding balance as of August 31, 2002, was approximately $876,435.

5. Note payable to Southwest Minnesota Foundation, due in monthly installments of $1,856 through July 2005, including interest at 7.5%, secured by mortgage and all assets of the Seller and personally guaranteed by Gregory Jaunich. Outstanding balance as of August 31, 2002, was approximately $183,871.

6. Capital lease obligations (for furniture) with Advanta (Preferred Capital Corporation) dated July, 1999, with monthly installments of $2,022.35 for 60 months.

7. Capital lease obligations (for furniture) with GCI Capital as follows:

   Schedule 1 dated as of January 22, 2001, monthly installments of $4,122.39 for 61 months;
   Schedule 2 dated as March 1, 2001, monthly installments of $1,904.25 for 61 months;
   Schedule 3 dated as of June 20, 2001, monthly installments of $1,844.61 for 61 months;
   Schedule 4 dated as of November 1, 2002, monthly installments of $2,484.87 for 61 months.

8. Capital lease obligations (for computer equipment) with Preferred Capital Corporation, (Lease Acceptance), lease number 314950, due in monthly installments of $1,777.27 through November 2004.

9. Capital lease obligations (for computer equipment) with Preferred Capital Corporation due in monthly installments of $1,761.45 through January 2003.

15

CONFIDENTIAL

NAE00022

10.    Capital lease obligations (for computer equipment) with Preferred Capital Corporation, lease number 313769002, due in monthly installments of $1,817.11 through May 2003.

11.    Equipment Lease Agreement with Conseco Finance Vendor Services Corporation (for Gateway Computer and printer), with monthly installments of $141.01 through May 2003.

12.    Dell Financial Services Leases for Lease Number 008651997-001, with monthly installments of $84.74 through October 2002; and Lease Number 001203329, with monthly installments of $97.03 through June 2003.

13.    Note payable to financing corporation (Amex) dated September 7, 1999, due in monthly installments of $515.51 through September 2004 including imputed interest at 12.99%, unsecured. Outstanding balance as of August 31, 2002, was approximately $10,854.

14.    Notes payable to financing corporation (Amex) dated September 20, 1999, due in monthly installments or $1,179, through October 2002 including imputed interest at 12.9%, secured by equipment. Outstanding balance as of August 31, 2002, was approximately $1,166.

15.    Note payable to an auto financing corporation (for Mercedes Benz), due in monthly installments of $478 through April 2004, including imputed interest at 8%, secured by vehicle. Outstanding balance as of August 31, 2002, was approximately $8,510.

16.    Note payable to an auto financing corporation (for GMAC Savanna), due in monthly installments of $399 through February 2004 including imputed interest at 8%, secured by vehicle. Outstanding balance as of August 31, 2002, was approximately $6,146.

17.    Note payable to (Amex) financing corporation (for computer equipment), due in monthly installments of $349 through March 2003, including imputed interest at 12.9%, secured by equipment. Outstanding balance as of August 31, 2002, was approximately $2,006.

18.    Northwestern Mutual Life, policy # 15-228-340, for a $2,300,000 life insurance policy on Gregory Jaunich as required by financing agreements for the Midwest Center for Wind Energy.

19.    Rental Agreement by and between NAE and Konica Business Technologies with monthly installments of $335.70, providing use of a copier.

20.    Wind Lease by and between NAE and Northern Alternative Energy Shaokatan Power Partners, LLC.

CONFIDENTIAL    NAE00023

## Schedule 3(d)

## OTHER PROPERTY

1.    Vehicle - 1999 Chevrolet Blazer, purchase June 26, 2002.

2.    Vehicle - 1999 Chevrolet pick-up, purchase June 26, 2002.

3.    All other personal property, furniture, fixture and equipment located on the Real Property and owned by the Seller.

CONFIDENTIAL       NAE00024

**Schedule 4(b)**

## NOTES PAYABLE TO SUBSIDIARY INTERESTS

1.  Note Payable to Northern Alternative Energy Allendorf, LLC. The note is non-interest
    bearing and as of December 31, 2000 has an outstanding balance of $764,499.

CONFIDENTIAL     NAE00025

## Schedule 7(d)

## <u>SUBSIDIARY INTEREST ENCUMBRANCES</u>

1.  NAE Allendorf:

    a.  Heritage State Bank Note dated April 1997, monthly installments $4,802, due September 2012 (Financing statement 1935087 Minnesota Secretary of State).

    b.  Iowa Energy Center Note dated April 1997, monthly installments of $1,389, due September 2012.

2.  NAE Sibley:

    a.  First Minnesota Bank Note dated December 16, 1996, monthly installments of $7,144 due December 2011(financing statement 1902396 Minnesota Secretary of State).

CONFIDENTIAL

NAE00026

**Schedule 7(e)**

## DEFAULTS UNDER ASSUMED CONTRACTS

None.

CONFIDENTIAL       NAE00027

## Schedule 7(f)

## PERMITTED ENCUMBRANCES

1.   UCC Fixture Financing Statement, dated January 3, 2000, filed with the Minnesota Secretary of State on January 6, 2000, as Document No. 151081, in favor of The First National Bank and Trust.

2.   Real Estate Mortgage, dated January 3, 2000, recorded with the Lincoln County Recorder on January 6, 2000, as Document No. 151082, in favor of The First National Bank and Trust; as amended by the Amendment to Real Estate Mortgage, dated August 17, 2000, recorded with the Lincoln County Recorder on August 28, 2000, as Document No. 152331; as further amended by the Second Amendment of Mortgage, dated December 13, 2000, recorded with the Lincoln County Recorder on December 27, 2000, as Document No. 153054.

3.   Mortgage, dated August 1, 2000, recorded with the Lincoln County Recorder on August 8, 2000, as Document No. 152211, in favor of Prairieland Economic Development Corporation, whose interest was assigned to the US Small Business Administration pursuant to the Assignment of Mortgage, dated August 1, 2000, recorded with the Lincoln County Recorder on August 8, 2000, as Document No. 152212.

4.   Assignment of Leases and Rents, dated August 1, 2000, recorded with the Lincoln County Recorder on August 8, 2000, as Document No. 152214, in favor of Prairieland Economic Development Corporation, whose interest was assigned to the US Small Business Administration.

5.   Mortgage, dated August 1, 2000, recorded with the Lincoln County Recorder on August 8, 2000, as Document No. 152218, in favor of Southwest Minnesota Foundation.

6.   Land Lease and Wind Easement, dated May 30, 2000, recorded with the Lincoln County Recorder on June 2, 2000, as Document No. 151819, by and between Northern Alternative Energy, Inc., as lessor, and NAE Shaokatan Power Partners, LLC, as lessee.

7.   Mechanic's Lien Statement dated June 18, 2001, filed June 21, 2001, as Doc. No. 153798, in the original amount of $107,245.00, on behalf of Hasslen Construction Co., Inc.; as amended by Amended Mechanic's Lien Statement dated June 18, 2001, filed June 22, 2001, as Doc. No. 153803.

8.   Mechanic's Lien Statement dated September 12, 2001, filed September 13, 2001, as Doc. No. 154210, in the original amount of $2,106.25, on behalf of Robert J. Hartinger d/b/a Bob's Nursery.

CONFIDENTIAL   NAE00028

9.  Mechanic's Line Statement dated December 28, 2001, filed January 2, 2002, as Doc. No. 154702, in the original amount of $7,331.54, on behalf of Larry Sterzinger.

10. Mechanic's Lien Statement dated January 7, 2000, filed January 10, 2002, as Doc. No. 154754, in the original amount f $244,912.91, on behalf of Wanzek Construction, Inc.

11. Notice of Lis Pendens dated July 23, 2002, filed July 25, 2002, as Doc. No. 155851, between Wanzek Construction, Inc., as Plaintiff, and Northern Alternative Energy, Inc., et. al., Defendants, Lincoln County Case NO. 41-C2-02-108.

CONFIDENTIAL

NAE00029

# EXHIBIT E



# NAVITAS™ ENERGY



Welcome to NAVITAS Energy - Generating a cleaner environment

**Home**
**Company News**
Press Releases
Media Features
▸ **Wind Projects**
▸ **Windpower Info**
▸ **Buy Green Tags**
▸ **About Navitas**
▸ **Contact Navitas**

## Navitas™ Energy Company News

**Navitas & Gamesa Sign SPA**

**Navitas Energy, Gamesa Sign a Stock Purchase Agreement**

*For Immediate Release*

MINNEAPOLIS, MN - The founder, president and CEO of the Minneapolis-based Navitas Energy, Inc. (Navitas), Greg Jaunich, and the CEO of Gamesa Energia S.A. (Gamesa) Iñaki Lopez Gandásegui, have signed a stock purchase agreement whereby Gamesa will acquire 75% of Navitas stock. Gamesa, of Madrid, Spain is one of the largest renewable companies in the world.

This agreement had its origin in a Joint Development Agreement that both companies signed in May for the development of wind energy production facilities in the United States. The investment by Gamesa in Navitas allows it to rapidly enter into the United States wind power market, immediately expanding the scope of Gamesa's operations in America.

Navitas, with headquarters in Minneapolis, Minnesota, has been involved in the promotion, development, and operation of wind energy production facilities for 10 years. Its president and CEO, Greg Jaunich, is a member of the American Wind Energy Association (AWEA) and serves on its Board of Directors. Gamesa intends to keep all of Navitas' staff and expand its operations.

Navitas has various wind energy projects in four states in different phases of development. With a total of 800 MW in development, this number will quickly increase thanks to the support of Gamesa, and its large operations in Europe. With these new Navitas wind energy developments, the direct sales of Gamesa wind turbines will increase considerably, providing Gamesa with 80MW of wind turbine sales in the second half of 2003.

The investment in Navitas is an important step in the process of international growth of Gamesa. Gamesa places great strategic importance United States wind market. Navitas is situated in the Midwestern United States, an area which has been identified as a major region for growth in the wind energy industry.

For more information call Greg Jaunich, 612-370-1061.

For more information please contact:
Greg Jaunich
Phone 612.370.1061
gjaunich@windpower.com

Back to List

© 2001 NAVITAS Energy™, Inc. All rights reserved.
3001 Broadway Street NE, Suite 695 - Minneapolis, MN 55413-1707 - Phone (612) 370-1061 - Fax (612) 370-9005




# NAVITAS™ ENERGY

Welcome to NAVITAS Energy – Generating a cleaner environment

▸ **Home**
▸ **Company News**
▸ **Wind Projects**
▸ **Windpower Info**
▸ **Buy Green Tags**
▸ **About Navitas**
▸ **Contact Navitas**

## Welcome to Navitas™ Energy

Navitas Energy, Inc. is a leading wind power developer, dedicated to providing customers with low cost, high quality, reliable wind power generation.

Navitas Energy generates a cleaner environment with each power plant that we build. We sell Wind Energy and Turbo-Wind Energy to electric utilities, co-ops and municipals who want to give the people the "power to choose ... a cleaner environment." That investment ensures a cleaner future for us all and will pay dividends in clean air for future generations.



### Navitas Energy Power Production

Navitas Energy's wind farms have produced over 450,905,000 kilowatt-hours of clean and cost-effective wind energy as of May 30, 2003.



We extend our deepest sympathies to those affected by the tragic events on Tuesday, September 11th. We hold you in our thoughts and prayers.

## Press Releases

Navitas & Gamesa Sign SPA

Busy summer for Navitas Energy



## NAVITAS Family of Companies

**NAVITAS ENERGY INC.**
Developing renewable supply resources and building wind farms with innovative technology.

**NORTHERN ALTERNATIVE ENERGY INC.**
Developing small wind farms under 2 MW in Minnesota since 1992.

**MIDWEST CENTER FOR WIND ENERGY**
Interpretive Center, Maintenance Facility and Inn located in the heart of Buffalo Ridge - Hendricks, Minnesota.

**EZWATT.COM**
Partnering with utilities to give consumers "The Power to Choose - a cleaner environment" by voluntarily electing renewable energy sources from the convenience of home.

© 2001 NAVITAS Energy™, Inc. All rights reserved.
3001 Broadway Street NE, Suite 695 - Minneapolis, MN 55413-1707 - Phone (612) 370-1061 - Fax (612) 370-9005



# NAVITAS ENERGY



Welcome to NAVITAS Energy - Generating a cleaner environment

▸ Home
▸ Company News
▸ Wind Projects
▸ Windpower Info
▸ Buy Green Tags
   About Navitas
   Vision
   Project Development
   Companies
   People
▸ Contact Navitas

## Navitas™ Energy • Our People

**Gregory J. Jaunich**
President and CEO

Gregory J. Jaunich is the founder, President and CEO, of Navitas Energy, Inc. and CEO of Northern Alternative Energy, Inc. (NAE). Mr. Jaunich has been responsible for the development, marketing, and finance of wind energy production facilities and gas- wind hybrid facilities for the past 9 years.



Mr. Jaunich has raised over 70 million dollars in project finance including a private placement of stock in NAE. Mr. Jaunich is the inventor and has a patent pending on wind driven electrical energy resources using firm power from fuel driven energy resources.

Mr. Jaunich holds a Bachelor of Arts degree from St. John's University in Collegeville, MN. Mr. Jaunich is an elected director and Treasurer of the American Wind Energy Association. Nationally recognized as a leader in his field, he also serves as a director for Energy Alley, a Minnesota non- profit organization dedicated to promoting energy efficiency and renewable energy technologies. He also serves on the board of directors of Feedbackshop.com.

**Contact Information**
Phone (612) 370-1061
Fax (612) 370-9005
E-Mail gjaunich@windpower.com

Back to Our People

© 2001 NAVITAS Energy™, Inc. All rights reserved.
3001 Broadway Street NE, Suite 695 - Minneapolis, MN 55413-1707 - Phone (612) 370-1061 - Fax (612) 370-9005





# NAVITAS™ ENERGY

Welcome to NAVITAS Energy - Generating a cleaner environment

▶ **Home**
▶ **Company News**
▶ **Wind Projects**
▶ **Windpower Info**
▶ **Buy Green Tags**
  **About Navitas**
  **Vision**
  **Project Development**
  **Companies**
  **People**
▶ **Contact Navitas**

## Navitas™ Energy • Our People

**John Jaunich**
President, Northern Alternative Energy



John E. Jaunich is the Executive Officer of Northern Alternative Energy, which was formally established as a corporation in 1992. Mr. Jaunich plans and directs all aspects of the organization's operational policies, objectives and initiatives related to project management, engineering, procurement, construction, operations and maintenance of wind development. He is also responsible for discovery of business development opportunities and site selection as the Senior Business Consultant for the Navitas Energy Group.

Mr. Jaunich's educational background includes the University of Minnesota, and certified as a Systems Engineer from Minnesota School of Business, Minneapolis, MN. Mr. Jaunich has over twenty-five years experience in "mainframe" computer application project development. This project management background, and the past twelve years experience in the municipal utility arena, enhances his ability to develop and manage "wind farm development" from conception to completion.

Mr. Jaunich has served as past President, Quadra Computer Consulting 1991-2001. President Delano Economic Development Authority 1996-2002. Minnesota League of Cities Telecommunication Task Force. Mayor City of Delano 1996-2002.

**Contact Information**
Phone 612.370.1061
Fax 612.370.9005
E-Mail jjaunich@windpower.com

Back to Our People

© 2001 NAVITAS Energy™, Inc. All rights reserved.
3001 Broadway Street NE, Suite 695 - Minneapolis, MN 55413-1707 - Phone (612) 370-1061 - Fax (612) 370-9005





NAVITAS - Contact Us

# NAVITAS ENERGY™

Welcome to NAVITAS Energy – Generating a cleaner environment

- **Home**
- **Company News**
- **Wind Projects**
- **Windpower Info**
- **Buy Green Tags**
- **About Navitas**
- **Contact Navitas**

## Contacting Navitas™ Energy

**NAVITAS ENERGY, INC.**
3001 Broadway Street NE
Suite 695
Minneapolis, MN 55413-1707
Phone (612) 370-1061
Fax (612) 370-9005
info@windpower.com

**NORTHERN ALTERNATIVE ENERGY INC.**
3001 Broadway Street NE
Suite 695
Minneapolis, MN 55413-1707
Phone (612) 370-1061
Fax (612) 370-9005
info@windpower.com

**MIDWEST CENTER FOR WIND ENERGY**
RR 2 Box 203
Hendricks, MN 56136
Phone (507) 275-4062
Fax (507) 275-4054

**ONLINE CONTACT FORM**
Click on the link above to contact us online.

**DIRECTIONS**
Directions to NAVITAS Energy provided by Mapquest.com.

---

**Please Note:** For information on small residential wind systems check out the list of manufacturers of such systems provided by the American Wind Energy Association (AWEA)on the World Wide Web.

---



NAVITAS Energy's headquarters in Minneapolis, Minnesota.

© 2001 NAVITAS Energy™, Inc. All rights reserved.
3001 Broadway Street NE, Suite 695 - Minneapolis, MN 55413-1707 - Phone (612) 370-1061 - Fax (612) 370-9005